## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Phoenix Payment Systems, Inc. | ) | Case No. 14-_____ (_____) |
| | ) | |
| Debtor. | ) | |
| | ) | |

### DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTOR (A) TO OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED BASIS AND GRANTING PRIMING LIENS AND (B) TO USE CASH COLLATERAL,  (II) GRANTING ADEQUATE PROTECTION TO THE DIP LENDER, (III) SCHEDULING A FINAL HEARING, AND (IV) GRANTING RELATED RELIEF

The above-captioned debtor and debtor in possession (the "**Debtor**") hereby submits this motion (the "**Motion**") for entry of an interim order (the "**Interim Order**"),[1] substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final Order"), authorizing and approving a secured post-petition debtor in possession financing facility and authorizing use of cash collateral in connection therewith.  In support of this Motion, the Debtor incorporates the statements contained in the *Declaration of Michael E. Jacoby in Support of Chapter 11 Petition and First-Day Motions* (the "**First Day Declaration**") filed contemporaneously herewith and further respectfully state as follows.

### JURISDICTION

1.     This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.  The predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 507 and 522 of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal

---

[1]      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Interim Order or in the DIP Credit Agreement (as defined below).

Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1, 4001-2 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**").

**BACKGROUND**

2.     On the date hereof (the "**Petition Date**"), the Debtor filed a voluntary petition in this Court commencing a case for relief under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Case**").  The factual background regarding the Debtor, including its business operations, its capital and debt structure and the events leading to the filing of the Chapter 11 Case, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.

3.     The Debtor continues to manage and operate its business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been requested in the Chapter 11 Case and no committee has yet been appointed.

4.     As described in the First Day Declaration, the Debtor has commenced this Chapter 11 Case with the goal of pursuing a value maximizing sale transaction.

**SUMMARY OF THE DEBTOR'S BUSINESS**

**A.     General Background**

5.     Founded on March 4, 2004, the Debtor is an international payment processor with corporate headquarters in Wilmington, Delaware and technology headquarters in Phoenix, Arizona.  The Debtor provides secure, reliable, easy-to-use and cost-effective acceptance, processing, support, authorization and settlement services for credit card, debit card and e-check payments.

6.     The Debtor, a top 35 merchant processor, has direct connections to all four major card associations, which establish all payment types in all payment environments.  Providing processing services at more than 8,700 locations worldwide, the Debtor processed, in multiple

currencies, approximately 280 million transactions in 2013 and expects to process 400 million transactions in 2014.  The Debtor serves hundreds of merchants (the "**Merchants**") and financial institutions, including Fortune 500 firms, large public entities and governments and small-to-medium businesses.

7.     The Debtor provides its services through its proprietary software and systems platform which was designed and built from the ground up in 2004 to address current and future front- and back-end processing needs.  This feature-rich platform includes: secure payment processing; a "webSuite" which allows for real-time, web-based reporting, data analysis and exports, exception transactions, chargebacks and merchant statements; a "PayPage" that enables eCommerce merchants to outsource online payment acceptance; a virtual terminal offering mode for processing point-of-sale, mail order/telephone order and eCommerce transactions; and a "vPost" which emulates all of the functionality of a high-volume point-of-sale terminal through a web browser.

    **B.**    **The Debtor's Relationship with Bancorp**

        *i.*    *The Bancorp Agreements*

8.     The Debtor derives substantially all of its revenues from merchants whose customers pay with VISA U.S.A. Inc. ("**VISA**"), MasterCard International Incorporated ("**MasterCard**"), Discover Financial Services ("**Discover**") and American Express ("**Amex**," and collectively, the "**Associations**").  The Debtor's ability to provide the Merchants with access to, and process merchant payment transactions with, the Associations is vital to the Debtor's ongoing business as an independent sales organization.  In order to be in a position to accept and receive credit for purchases made with VISA or MasterCard credit cards, the Merchants must be a party to a merchant services agreement or similar agreement with a party that has access to the VISA/MasterCard payment and collection systems.  The Bancorp Bank ("**Bancorp**") currently is

such a party that has access to the VISA/MasterCard payment and collections systems.  Pursuant to the processing agreements discussed below, Bancorp (i) sponsors sales and credit transactions submitted by the Debtor's Merchants whose customers use their VISA or MasterCard credit cards; (ii) sponsors the Debtor into the Associations as an independent sales organization and establishes and maintains a dedicated segregated Association Bank Identification Number (BIN) and Interbank Card Association (ICA) for Debtor; (iii) and makes payment to VISA and MasterCard for fees, and then makes certain settlement payments to the Debtor.  In addition, as a result of overdrafts and negative cash flow, Bancorp advanced monies to the Debtor in connection with the processing of transactions above, over a period of years, which sums were secured (together with the Guaranty of Moyer Obligations (defined below)) against all of the assets of the Debtor.  The advances and guaranty obligations enabled the Debtor to continue to operate while in a cash deficit position.

9.      As a result, the Debtor has multiple agreements with Bancorp.  They fall into two categories:  (a) agreements that enable the Debtor to operate its business with Bancorp as its sponsor bank, including (i) the ISO Agreement, dated May 31, 2005, and all related schedules and ancillary agreements attached thereto, including that certain Surety Agreement (the "**Surety Agreement**") executed by Raymond D. Moyer, the largest stockholder of the Debtor and the Debtor's former Chief Executive Officer ("**Moyer**") (as amended pursuant to the First Amendment to the ISO Agreement, dated June 1, 2010, and the Second Amendment to the ISO Agreement, dated November 31, 2011, the "**ISO Agreement**"); (ii) the Processor Agreement, effective May 31, 2005 (as amended pursuant to the First Amendment to the Processor Agreement, dated June 1, 2010, the "**Processor Agreement**"); (iii) the Sponsorship Agreement, dated May 31, 2005 (as amended pursuant to the First Amendment to the Sponsorship

Agreement, dated June 1, 2010, the "**Sponsorship Agreement**"); and (iv) the Originating Depository Financing Institution Agreement, dated June 15, 2007; and (b) financial accommodation arrangements, including the financial accommodation letter from Bancorp to the Debtor, accepted on April 11, 2012 (the "**Accommodation Agreement**") and all exhibits thereto, including that certain Security Agreement, dated April 11, 2012 (as amended on or about June 27, 2012 and further amended on May 9, 2014, the "**Security Agreement**").   All of these agreements are collectively referred to herein as the "**Bancorp Agreements**."

10.     In addition to the Bancorp Agreements, Moyer personally was a party to several agreements with Bancorp, including, (a) in 2002, a promissory note, credit agreement (which was modified in 2010) and mortgage whereby Bancorp extended a loan in the original principal amount of $2,000,000.00 to Moyer (the "**Moyer Loan Documents**"), and (b) the Stock Pledge and Security Agreement, dated April 11, 2011 (as amended twice on June 27, 2012, the "**Stock Pledge**," and together with the Moyer Loan Documents, the "**Moyer Agreements**"), between Moyer and Bancorp, and the Agreement and Acknowledgement of Stock Pledge executed by the Debtor on April 11, 2011.   The obligations under the Moyer Loan Documents were secured by Moyer's personal residence located in Pennsylvania.   As explained below, the Debtor later guaranteed Moyer's obligations under the Moyer Loan Documents, and the obligations under the Guaranty of Moyer Obligations (defined below) are governed by the Security Agreement.

11.     The purpose and relevant provisions of each Bancorp Agreement and Moyer Agreement are as follows:

- The ISO Agreement

    - establishes the Debtor as an "Independent Sales Organization" (an "**ISO**");

    - sets forth the Debtor's duties, among other things, as (a) marketing Bancorp's transaction processing and other services relating to transactions that use payment cards of VISA and Mastercard, (b) providing software or technical documentation

and technical support in order to allow the Merchants to process sales transactions through the VISA/MasterCard processing systems, and (c) providing authorization, settlement, chargeback processing and reporting, 24 hours per day, 365 days per year; and

♦ provides that accepted Merchants, Bancorp, and the Debtor enter into a merchant agreement (each such agreement a "**Merchant Agreement**").

- The Surety Agreement serves as a guaranty from Moyer to Bancorp of the obligations of the Merchants under the Merchant Agreements.

- The Processor Agreement engages the Debtor to provide merchant processing and settlement services for the benefit of the Merchants on behalf of Bancorp, in its capacity as a licensee of VISA and MasterCard.

- The Sponsorship Agreement provides the Debtor with sponsorship services from Bancorp that VISA and MasterCard require in exchange for providing endpoint processing equipment.

- The Accommodation Agreement provides the Debtor with extensions of credit and extensions of payment terms from Bancorp under the Bancorp Agreements.

- The Security Agreement establishes a security interest in all of the assets of the Debtor to secure the Debtor's obligations to Bancorp.

- The Stock Pledge establishes a security interest in all of Moyer's stock certificates in the Debtor to secure Moyer's obligations under the Surety Agreement and grants an irrevocable voting proxy, exercisable at Bancorp's election upon a continuing event of default, to vote, as Moyer's proxy, Moyer's shares.

ii.    *The Debtor's Obligations to Bancorp Under the Bancorp Agreements and the Guaranty of Moyer Obligations and the Forbearances*

12.    In May 2012, the Debtor defaulted under the Bancorp Agreements and Moyer defaulted under the Bancorp Agreements and the Moyer Loan Documents.  Pursuant to that certain Forbearance Agreement, dated as of June 27, 2012 (the "**Forbearance Agreement**"), Bancorp agreed to forbear from exercising its remedies under the Bancorp Agreements during the period of time commencing on June 27, 2012 and ending on the earlier of October 1, 2013 or the occurrence of certain events specified in the Forbearance Agreement, including failure to comply with the Forbearance Agreement or any of the Bancorp Agreements, failure to make

agreed payments to Bancorp, failure to maintain a positive cash balance, or the occurrence of certain insolvency events involving the Debtor or Moyer.

13.     In exchange for Bancorp's agreement to forbear, the Debtor agreed, among other things, to (a) pay a forbearance fee and (b) provide an unconditional and absolute guaranty of payment to Bancorp of the obligations under the Moyer Loan Documents (the "**Guaranty of Moyer Obligations**").  The Guaranty of Moyer Obligations was secured by all assets of the Debtor other than computer equipment that is leased to the Debtor and Moyer's stock certificates in the Debtor pursuant to the Security Agreement and the Stock Pledge.

14.     In February 2013, the Debtor, Bancorp and Moyer entered into the first amendment to the Forbearance Agreement (the "**First Amendment**").  Pursuant to the First Amendment, Bancorp agreed to delay invoicing the Debtor for certain fines assessed by VISA in November and December of 2012.  Throughout 2013 and in January 2014, the Debtor received multiple notices of default from Bancorp of the Bancorp Agreements and the Forbearance Agreement.  All of the obligations due under the Bancorp Agreements, the Forbearance Agreement and the Guaranty of Moyer Obligations were accelerated and due in full.  However, the Debtor had no means to and did not make the payments.

15.     On February 3, 2014, Bancorp exercised its right under the Stock Pledge and Voting Proxy to serve as Moyer's proxy for the purpose of voting Moyer's stock (which represents a majority of voting shares of the Debtor's stock) to remove Moyer as the sole director of the board of directors and replace him with an independent director.  In turn, the independent director (constituting 100% of the board of directors) exercised a written consent removing Moyer from his position as the Debtor's Chief Executive Officer and terminating his employment with the Debtor.  As set forth in further detail below, the independent director also

authorized the retention of the Debtor's Chief Restructuring Officer.  Later, the board was expanded to three directors, and Nancy Reilly, who had been (and continues to be) the Debtor's Chief Financial Officer, was named as the Debtor's new Chief Executive Officer.

16.    On May 9, 2014, the Debtor and Bancorp entered into the Second Forbearance Agreement (the "**Second Forbearance Agreement**").  The Second Forbearance Agreement confirms that, as of May 8, 2014, the Debtor was indebted to Bancorp in the aggregate amount of at least $3,123,620.74 (the "**Bancorp Obligations**"), $1,759,175.25 of which was the Guaranty of Moyer Obligations.  The Debtor's obligations to Bancorp are secured by a lien on all of the Debtor's property other than equipment that is leased to the Debtor.  As of July 31, 2014, the Debtor was indebted to Bancorp in the aggregate amount of $6.2 million.

17.    In exchange for Bancorp's agreement to continue to forebear from exercising its remedies under the Bancorp Agreements, the Forbearance Agreement and the Guaranty of Moyer Obligations and continuation of the processing and sponsorship agreements, the Debtor agreed to consummate a transaction meeting the specifications set forth in the Second Forbearance Agreement within certain milestones, including entering into a definitive agreement for a transaction with a purchaser/investor that is reasonably acceptable to Bancorp on or before June 30, 2014 and closing a transaction with an approved purchaser on or before August 31, 2014.   These milestone dates were subsequently extended to July 21, 2014 and September 8, 2014, respectively.

### C.    Capital Structure

18.    As of the Petition Date, the Debtor had total outstanding liabilities and other obligations of approximately $16.6 million and approximately 9.8 million shares of outstanding preferred and common stock.  A detailed discussion of the Debtor's debt structure is set forth below.

19.     As set forth above, the Debtor has certain monetary obligations to Bancorp pursuant to the Bancorp Agreements and the Guaranty of Moyer Obligations.  As further set forth above, the aggregate amount of these obligations as of May 8, 2014 was approximately $3,123,620.74.  The Debtor estimates that as of July 31, 2014 the Debtor's obligations to Bancorp are approximately $6.2 million.  Pursuant to the Security Agreement, Bancorp holds a first priority lien on all of the Debtor's assets other than equipment leased to the Debtor to secure these obligations.

20.     In addition to the secured obligations due to Bancorp, the Debtor has approximately $471,345 in second lien debt in favor of the law firm of Wollmuth, Maher & Deutsch, LLP.  The Debtor also has capital lease obligations in an approximate amount of $161,881 as of May 31, 2014.  The remainder of its liabilities are unsecured and were incurred in the ordinary course of business and total approximately $9.7 million.

### D.     Events Leading Up to the Chapter 11 Case

> i.     *The Debtor's Defaults Under the Bancorp Agreements and the Guaranty of Moyer Obligations; Appointment of Chief Restructuring Officer*

21.     As set forth above, in 2012, the Debtor defaulted under the Bancorp Agreement and has been operating under forbearance agreements since that time.  The Second Forbearance Agreement, dated May 9, 2014, required the Debtor to consummate a transaction within the milestones set forth in paragraph 17 above and paragraph 21 of the Second Forbearance Agreement.  The transaction was required "to include termination of the [Bancorp Agreements] unless otherwise consented to by Bancorp."

22.     In addition, the Debtor has been cash flow insolvent since at least December 2013 (if not significantly earlier) and could not meet its debts as they came due without funding from Bancorp, which Bancorp was not required to provide.  Moreover, the Debtor was a defendant in

several lawsuits (with others threatened) and began suffering default and stipulated judgments due to its inability to pay undisputed claims as well as defense counsel to defend those suits.

23.     On February 3, 2014, following the termination of Moyer's employment, Michael Jacoby was appointed as Chief Restructuring Officer of the Debtor.  Upon his appointment and after evaluating the financial condition of the Debtor, the Debtor retained Raymond James to assist in advising on the Debtor's strategic options, including a recapitalization, investment, sale of assets, sale of stock or other transaction in or out of court.  Immediately upon its retention, Raymond James commenced the marketing process set forth below.

*ii.     Pre-Petition Marketing Efforts*

24.     With the Debtor's assistance, Raymond James identified financial and strategic investors (collectively, the "**Interested Parties**") to garner interest in pursuing a transaction with the Debtor of any type, including a sale, recapitalization or investment in the Debtor (a "**Potential Transaction**").  Commencing on March 25, 2014, Raymond James contacted and sent teasers to 140 Interested Parties.  Fifty-four (54) of them executed non-disclosure agreements and were asked to submit initial non-binding letters of intent ("**Initial LOIs**") by April 23, 2014.  Interested Parties that had executed non-disclosure agreements were then given the opportunity to gain access to an electronic data room.  On or around that date, nine (9) Interested Parties submitted Initial LOIs, all of which focused on acquiring the Debtor's assets or stock.  Accordingly, at that point, the Debtor devoted its attention and focus to pursuing a sale of its assets or stock.  Thereafter, six (6) Interested Parties attended management presentations at the Debtor's offices in Delaware or Arizona.

25.     Due, in large part, to the Debtor receiving a significant amount of interest from Interested Parties, and with the expectation that Interested Parties would increase and/or otherwise refine their offers for the Debtor's assets or stock once they performed further

diligence, Raymond James requested that Interested Parties submit revised non-binding letters of intent ("**2nd Round LOIs**") by May 27, 2014.  On or around the deadline, four (4) Interested Parties submitted 2nd Round LOIs.  After reviewing and carefully considering the letters of intent, the Debtor, in consultation with its advisors, (i) determined that it should provide Interested Parties with the option to submit yet another non-binding letter of intent ("**Best and Final LOIs**") to further increase the proposed purchase price for the Debtor's assets or stock and (ii) set June 17, 2014 as the deadline to submit Best and Final LOIs.  On or around such date, four (4) Interested Parties submitted Best and Final LOIs.  After reviewing and carefully considering the letters of intent, the Debtor determined, in consultation with its advisors, that the Best and Final LOI submitted by North American Bancard ("**NAB**") was the highest or otherwise best offer.

26.    On July 31, 2014, the Debtor and a wholly-owned subsidiary of NAB (the "**Purchaser**") entered into a stalking horse asset purchase agreement (the "**Stalking Horse Agreement**").  As a result of the robust and multi-staged pre-petition marketing process conducted by Raymond James, the proposed purchase price for the Debtor's assets under the Stalking Horse Agreement is 3.5 times greater than an indication of interest the Debtor received late in 2013 from NAB.  Moreover, the Stalking Horse Agreement provides the Debtor with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtor with a floor against which other bidders can submit competing bids for the Debtor's assets through an auction process.

27.    The Stalking Horse Agreement's $50 million purchase price also is highly attractive in that it is sufficient to pay all undisputed creditors in full and provides a substantial recovery for the Debtor's equity security holders.

### iii.    Anticipated Chapter 11 Process

28.    As set forth above, the Debtor has determined that value will be maximized by commencing a Chapter 11 case and continuing an orderly sale process.  While the pre-petition process already was extensive and lengthy, the commencement of this Chapter 11 Case and the implementation of a Bankruptcy Court supervised sale process allows other bidders to make competing bids and therefor to fully maximize the value of its estate for the benefit of the Debtor's stakeholders.

29.    A sale pursuant to Section 363 of the Bankruptcy Code is the most appropriate course of action for the Debtor.  As set forth above, if the proposed sale (the "**Sale**") is consummated, not only will the Debtor's creditors recover 100% on account of any allowed claims against the estate, but the Debtor's equity holders will also receive a significant distribution from the proceeds of the Sale.  The Debtor does not believe that the Sale could be consummated outside of this bankruptcy proceeding.  Among other reasons, while the purchaser originally was willing to entertain non-bankruptcy options, it required certain representations and warranties that the Debtor could not have provided in an out of court deal.  It also required certain third party consents that the Debtor was unable to obtain.  Accordingly, the Debtor commenced the Chapter 11 Case.

### THE DEBTOR'S NEED FOR POSTPETITION FINANCING

30.    As a consequence of the factors described herein and in the First Day Declaration, the Debtor has insufficient cash to finance its operations and to pay its employees.

31.    The Debtor engaged in arm's-length negotiations with Bancorp regarding the possibility of Bancorp providing postpetition financing, which ultimately resulted in reaching final agreement on the proposed DIP Facility.

32.     In addition, prior to the Petition Date, the Debtor, through its proposed investment banker Raymond James, solicited interest from third parties in providing the Debtor with postpetition financing.  Specifically, the Debtor developed a detailed confidential information memorandum describing the DIP financing opportunity along with the assets and operations of the Debtor as well as a teaser to solicit interest from parties prior to execution of appropriate non-disclosure agreements (**"NDAs"**). Raymond James contacted 34 potentially interested parties and sent teasers to 29 of those parties.  Six (6) of those parties executed NDAs and obtained further information about the Debtor, its financing needs, and its business and operations.  All six (6) of those parties expressed verbal or written indications of interest, all of which were on terms less favorable than those offered by from Bancorp.  As a result, the proposed financing offered by Bancorp is the best available to the Debtor.

33.     Indeed, virtually all of the Debtor's assets are encumbered by liens and security interests granted to Bancorp.  Thus, even if alternative debtor in possession financing were available on more favorable terms and conditions and could be consummated in a time frame required to address the Debtor's immediate liquidity needs, obtaining such financing would likely result in a difficult and protracted priming contest with Bancorp, which is also the Debtor's sponsor bank and therefore an integral party in the Debtor's day to day business.  Any uncertainty occasioned by the protracted financing litigation would be extremely damaging to the Debtor, thereby jeopardizing this Case and potentially the sale.

34.     Accordingly, the availability of working capital from the DIP Facility and the use of cash collateral will allow the Debtor to continue to operate in the ordinary course of business and allow it to move promptly forward with the Sale.  The DIP Facility will also instill great confidence in the Debtor's employees, customers, vendors, and other important stakeholders.

35.     In sum, without the immediate access to postpetition financing, the Debtor expects to suffer an acute cash shortage that would immediately and irreparably harm its stakeholders.  Furthermore, without access to the DIP Facility, the Debtor would lack sufficient funds to meet expenses necessary for the continued operation of its business.  The Debtor's ability to remain viable, to preserve the value of its estate for the benefit of its creditors and to pursue a value maximizing sale transaction depends upon the interim and final relief requested in this Motion being granted.

**RELIEF REQUESTED**

36.     By this Motion, the Debtor seeks (a) entry of the Interim Order and the Final Order: (i) authorizing the Debtor (in its capacity as postpetition borrower, the "**Borrower**") to obtain senior secured post-petition financing in an aggregate principal amount not to exceed the $5,000,000.00, pursuant to section 364 of the Bankruptcy Code, from Bancorp (in its capacity as postpetition lender, the "**DIP Lender**") the DIP Lender (ii) authorizing the Debtor to execute, deliver and enter into the DIP Facility and perform such other and further acts as may be required in connection with the DIP Facility; (iii) as set forth in more detail below, granting certain security interests, liens and superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code, liens pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Lender to secure all obligations of the Debtor under and with respect to the DIP Facility; (iv) authorizing the Debtor's use of cash collateral; (v) granting adequate protection to the Bancorp in its capacity as prepetition secured lender, whose liens and security interests are being primed by the DIP Facility; and (vi) modifying the automatic stay imposed under section 362 of the Bankruptcy Code; (b) requesting, pursuant to Bankruptcy Rule 4001 and the applicable Local Rules that an interim hearing on the Motion be held before the

Court to consider entry of the Interim Order, which authorizes the Debtor to borrow under the

DIP Facility, on an interim basis, up to an aggregate principal amount not to exceed $2,750,000;

and (c) requesting, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable

Local Rules, that the Court (i) schedule a Final Hearing on the Motion to consider entry of the

Final Order authorizing the balance of the borrowings and guarantees, as applicable, on a final

basis, and (ii) approve notice procedures with respect thereto.

## A.    The Proposed DIP Facility

37.    The Debtor proposes to borrow funds from the DIP Lender for working capital

and general corporate purposes, in an amount not to exceed $2,750,000 following entry of the

Interim Order and an amount not to exceed $5,000,000 upon entry of a Final Order.  The terms

of the DIP Facility are more specifically set forth in the DIP Credit Agreement, attached hereto

as **Exhibit B**.  The material terms of the DIP Facility are summarized below:[2]

| | |
|---|---|
| **Borrower:** | Phoenix Payment Systems, Inc. |
| **Lender:** | Bancorp |
| **Purpose and Use of Funds:**<br><br>**[Interim Order at ¶ 7(a), 28; DIP Credit Agreement § 7.13]** | The proceeds of the Advances under the DIP Credit Agreement, the Cash Collateral and Collections and Proceeds of Collateral shall be used solely (and for no other purpose) in accordance with the Budget, which shall include, inter alia, a partial paydown of the Prepetition Obligations, including interest and fees, in the amount of $1,500,000.00. None of the proceeds of the Advances, Cash Collateral, Collections, and Proceeds of Collateral, hereunder shall be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Orders, the Loan Documents or the Existing Credit Agreement, or the liens or claims granted under the Orders, the Loan Documents or the |

---

[2]    The summaries and descriptions of the terms and conditions of the DIP Documents and the proposed Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms thereof and should only be relied upon as such.  The summaries and descriptions are qualified entirely by the DIP Documents and the Interim Order.  In the event there is a conflict between this Motion and the DIP Documents or the Interim Order, the DIP Documents or the Interim Order, as applicable, shall control in all respects.

Existing Credit Agreement, (b) assert any claims, defenses or causes of action against the Lender, or its agents, affiliates, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the Lender's assertion, enforcement or realization on the Cash Collateral or the Collateral in accordance with the Loan Documents, the Existing Credit Agreement or the Orders, (d) seek to modify any of the rights granted to the Lender under the Orders, or under the Loan Documents or the Existing Credit Agreement, in each foregoing case without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an Order of this Court or (ii) in accordance with the terms of the Loan Documents. Notwithstanding the foregoing, up to $25,000 in the aggregate of the proceeds of the Advances or the Cash Collateral may be used by the Official Committee to investigate the prepetition Permitted Liens (or the perfection or priority thereof) and the claims of Lender secured thereby. Other than disbursements included in the Budget (including, the partial paydown of the Existing Credit Agreement), the Cash Collateral, the proceeds of the Advances under the DIP Credit Agreement, the Carve-Out and the other Collateral shall not be used (a) to the extent such action has not been waived in the Loan Documents or the Orders to permit Borrower, or any other party in interest or their representatives, to challenge or otherwise contest or initiate or participate in any proceeding (i) the validity, perfection or priority of security interests on assets of Borrower or its Affiliates in favor of Lender or Liens granted under the Orders or (ii) the enforceability of the obligations of Borrower under the Existing Credit Agreement, (b) to commence, participate in or prosecute any motion, proceeding or cause of action against Lender or its agents, attorneys, officers, directors, employees, advisors or representatives, including, with respect to the Existing Credit Agreement and Processing Agreements or (c) to fund acquisitions, capital expenditures, capital leases or other transactions not in the ordinary course of Borrower's business other than as specifically set forth in the Budget.

| | |
|---|---|
| **Type and Amount of the DIP Facility:**<br><br>**[Interim Order at ¶ 6]** | $5,000,000 revolving credit facility, $2,750,000 of which shall be available prior to entry of a Final Order. |
| **Conditions Precedent to DIP Facility:**<br><br>**[DIP Credit Agreement Ex.** | The obligation of DIP Lender to make its initial extension of credit provided for in the DIP Credit Agreement is subject to the fulfillment, to the satisfaction of  DIP Lender, of each of the following conditions precedent: |

**B]**

(a) the Closing Date shall occur on or before August 6, 2014;

(b) Lender shall have received a certificate from the Treasurer of Borrower (i) attesting to the resolutions of the Board of Directors of Borrower authorizing its execution, delivery, and performance of the Loan Documents, (ii) authorizing specific officers to execute the same, and (iii) attesting to the incumbency and signatures of such specific officers;

(c) Lender shall have received copies of the articles of incorporation and bylaws of Borrower, as amended, modified, or supplemented to the Closing Date, certified as true, correct and complete by the Treasurer of Borrower;

(d) Borrower shall have received all licenses, approvals or evidence of other actions required by any Governmental Authority in connection with the execution and delivery by Borrower of the Loan Documents or with the consummation of the transactions contemplated thereby;

(e) all other documents and legal matters in connection with the transactions contemplated by the DIP Credit Agreement shall have been delivered, executed, or recorded and shall be in form and substance satisfactory to Lender;

(f) Lender shall have received such other items as Lender shall have reasonably requested;

(g) Lender shall have received, not later than three Business Days following the Petition Date, a certified copy of the Interim Order by the Bankruptcy Court, which Interim Order shall, among other things, (i) authorize Borrower to enter into the DIP Credit Agreement and the other Loan Documents, in the amount and on the terms set forth in the DIP Credit Agreement and the other Loan Documents, (ii) approve the Loan Documents and grant the Lien and Superpriority Claim contemplated thereby and approve the fees provided for in the DIP Credit Agreement and (iv) not have been vacated, reversed, modified, amended or stayed;

(h) all first-day and related orders entered by the Bankruptcy Court in the Case shall be in form and substance satisfactory to Lender;

(i) Lender shall have received all fees required to be paid and all

Lender Expenses (including the reasonable fees and expenses of Lender's legal counsel and other professionals) on or before the Closing Date;

(j) no litigation shall have commenced which has not been stayed by the automatic stay or by the Bankruptcy Court which, if successful, would result in a Material Adverse Change other than the Case;

(k) Lender shall have received a legal opinion of counsel to Borrower in form and substance satisfactory to Lender;

(l) the representations and warranties of Borrower contained in the DIP Credit Agreement and/or in the other Loan Documents shall remain true and correct in all material respects;

(m) no Default or Event of Default shall have occurred and be continuing;

(n) the Bankruptcy Court shall have entered the Interim Order and such Interim Order shall be in effect, not have been stayed or otherwise subject to appeal and not have been amended or modified;

(o) if the Closing Date is more than 35 days after Petition Date, the Bankruptcy Court shall have entered the Final Order and such Final Order shall be in effect, not have been stayed or otherwise subject to appeal and not have been amended or modified;

(p) the entering into of the Loan Documents and the making of Advances thereunder shall not violate any Applicable Law and shall not be enjoined, temporarily, preliminarily or permanently;

(q) at the option of Lender, a Uniform Commercial Code financing statement shall have been filed with the Secretary of State of the State of Delaware listing Borrower as debtor and Lender as secured party perfecting Lender's security interest in the Collateral;

(r) all deposit account control agreements or similar control agreements with Lender in effect on the Petition Date, if any, shall remain in full force and effect;

(s) Lender shall have received the initial Budget in form and substance acceptable to Lender;

(t) the Interim Order and the Final Order shall be in form and substance satisfactory to Lender and all other motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Credit Agreement and the approval thereof shall be in form and substance reasonably satisfactory to Lender;

(u) Borrower's corporate structure shall not be altered;

(v) Lender shall have received a certificate of good standing of Borrower dated within ten Business Days of the Closing Date; and

(w) Borrower shall maintain insurance reasonably satisfactory to Lender and Lender shall have received additional insured and lender loss payee insurance certificates and endorsements, in each case satisfactory to Lender.

| | |
|---|---|
| **Termination:**<br><br>**[Interim Order at ¶ 13; DIP Credit Agreement § 2.7]** | The earliest to occur of (i) ninety (90) days after the Petition Date and (ii) the closing date of a sale under section 363 of the Bankruptcy Code of a portion of, or substantially all of, the Debtor's assets (in a single transaction or a series of transactions), the sale of 50% of more of the Debtor's voting equity ownership (whether in a single transaction or a series of transactions), or a merger or consolidation having a similar effect, in an amount necessary to satisfy the DIP Obligations in full (such date, the "Termination Date"). Notwithstanding the foregoing, the Termination Date may be extended for a period of thirty (30) days upon further written agreement of the DIP Lender and subject to payment of an extension fee in the amount of $50,000. |
| **Events of Default:**<br><br>**[Interim Order at ¶ 24; DIP Credit Agreement § 8]** | The following shall constitute an Event of Default under the DIP Facility and the Interim Order: (a) the failure to make payments when due; (b) noncompliance with covenants; (c) breaches of representations and warranties; (d) impairment of loan documentation or security; (e) material adverse change; (f) dismissal of the chapter 11 case or conversion to a chapter 7 case; (g) appointment of a chapter 11 trustee; (h) appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of any Borrower (excluding the CRO); (i) granting of relief from the automatic stay to permit foreclosure on assets of the Debtor, other than the granting of |

such relief to the DIP Lender following an Event of Default; (j) entry of an order granting any super-priority claim which is senior or *pari passu* with the DIP Lender's claims under the DIP Facility or the Existing Credit Agreement (other than the Carve Out); (k) amending, supplementing or otherwise modifying the Final DIP Order without the consent of the DIP Lender; (m) payment of or granting adequate protection with respect to pre-petition debt (other than as set forth in the Budget); (n) cessation of liens or super-priority claims granted with respect to the DIP Facility and Prepetition Obligations, to be valid, perfected and enforceable in all respects; (o) filing by the Debtor of a challenge to any of the liens securing obligations under the DIP Credit Agreement; (p) filing by the Debtor of a plan of reorganization that does not satisfy the DIP Obligations and Prepetition Obligations in full in cash; (q) or the payment of estate professional fees other than to the extent set forth in the Budget.

**Remedies:**

**[Interim Order at ¶ 25; DIP Credit Agreement § 9.1, 9.2]**

Upon the occurrence of an Event of Default, and after three business days' prior written notice by electronic mail (deemed received upon transmittal) to the Debtor, the Official Committee and the United States Trustee, at the DIP Lender's election and without further order of the Court: (1) the DIP Lender shall have automatic and immediate relief from the automatic stay with respect to the DIP Collateral (without regard to the passage of time provided for in Fed. R. Bankr. P. 4001(a)(3)) and shall be entitled to exercise all rights and remedies available to it under the Prepetition Credit Documents, the DIP Credit Documents and applicable nonbankruptcy law; and (2), subject to further agreement with respect to the funding of the Debtor's operations and the Case following an Event of Default, the Debtor shall reasonably cooperate with the DIP Lender in the exercise of its rights and remedies under the Prepetition Credit Documents, the DIP Credit Documents and applicable nonbankruptcy law.  From and after the Termination Date, the DIP Lender shall have no obligation to make advances to the Debtor under the DIP Facility or otherwise.

**Interest:**

**[Interim Order at ¶ 12; DIP Credit Agreement § 2.4]**

The Loan will bear interest at the prime rate plus two percent (2%). Interest will be payable monthly in arrears on the first day of each month.  All interest will be calculated using a 360 day year and actual days elapsed.  Upon the occurrence and during the continuance of an event of default under the DIP Facility, the obligations, following issuance of written notice from the DIP Lender, shall bear interest at a default rate of interest equal to an additional two percent (2%) per annum over the rate otherwise applicable and such interest will be payable on demand.

**Bankruptcy Milestones**

**[Interim Order at 4(h)(i); DIP Credit Agreement § 6.24]**

The DIP Credit Agreement contains the following milestones related to the Case:

    a.    Prior to the Petition Date, Borrower shall enter into an asset purchase agreement with a stalking horse bidder with respect to the Sale, for aggregate net cash consideration in a minimum amount necessary to Repay in Full the Obligations and all amounts due under the Existing Credit Agreement on terms reasonably satisfactory to Lender, including without limitation with no financing or diligence contingencies.

    b.    Within 25 days after the Petition Date, Borrower shall have obtained from the Bankruptcy Court an order approving bid procedures (the "Bid Procedures Order") with respect to the Sale in form and substance reasonably satisfactory to Lender.

    c.    An auction, if any, shall take place two Business Days after the bid deadline set forth in the Bid Procedures Order, but in any event no later than 60 days after the Petition Date.

    d.    The Bankruptcy Court shall have an entered an order approving the Sale to the highest bidder within 5 Business Days after the auction (if any) but in any event no later than 65 days after the Petition Date.

    e.    The Sale shall close no later than 90 days after the Petition Date, for aggregate net cash consideration in a minimum amount necessary to Repay in Full the Obligations and all amounts due under the Existing Credit Agreement on terms reasonably satisfactory to Lender.

**Fees, Costs and Expenses:**

**[DIP Credit Agreement § 2.10]**

Borrower shall pay to Lender the non-refundable fees set forth below:

    f.    **Closing Fee.** On the Closing Date, Borrower shall pay to Lender a closing fee in the amount of seventy-five thousand dollars ($75,000.00).

    g.    **Exit Fee.** On the Termination Date, Borrower shall pay to Lender an exit fee in the amount of seventy-five thousand dollars ($75,000.00).

    h.    **Extension Fee.** If Lender agrees to extend the Termination Date pursuant to Section 2.7, Borrower shall pay to Lender an extension fee in the amount of fifty thousand dollars

($50,000.00) on the date which Lender so agrees.

      i.    **Existing Credit Agreement.** All other undisputed fees outstanding under the Existing Credit Agreement.

**Security Under DIP Facility:**

**[Interim Order at ¶¶ 9, 10; DIP Credit Agreement § 2.12(b), (c), and (d)]**

The DIP Obligations shall (i) pursuant to section 364(c)(2) of the Bankruptcy Code, shall at all times be secured by a security interest in the Collateral that constitutes a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all of the Collateral, including, but not limited to all of the pre- and postpetition property of Borrower, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date, is not subject to valid, perfected and non-avoidable liens, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, deposit accounts, intercompany claims, claims against affiliates, avoidance actions (subject to entry of the Final Order), and all other products and proceeds thereof; (ii) pursuant to section 364(d)(1) of the Bankruptcy Code, shall at all times be secured by a security interest in the Collateral that constitutes a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all of the Collateral, including, but not limited to all of the pre- and postpetition assets of the Debtor, whether now existing or hereafter acquired, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, deposit accounts, intercompany claims, claims against affiliates, avoidance actions (subject to entry of the Final Order), and all other products and proceeds thereof, regardless whether such property is subject to the existing liens presently securing Debtor's obligations, including such obligations under the Existing Credit Agreement and obligations to Wollmuth Maher; provided, however, that pending entry of the Final Order, any valid, perfected and unavoidable Permitted Liens in existence immediately prior to the Petition Date, that, as of the Petition Date, are senior to the liens of the Lender securing the Prepetition Obligations, if any (the "Senior Liens") will not be primed pursuant to this subsection and will instead be subject to subsection (iii) below; (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, shall at all times be secured by a security interest in the Collateral that

constitutes a valid, binding, continuing, enforceable, fully-perfected security interest in and liens upon all of the Collateral, including, but not limited to, all of the pre- and postpetition property of the Debtor (other than (i) the property described in clauses (i) or (ii) above, as to which the liens and security interests in favor of the DIP Lender will be as described in such clauses), whether now existing or hereafter acquired, and such security interests and liens shall be junior to Senior Liens and to any valid and unavoidable Permitted Liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

**Superpriority Claim:**

**[Interim Order at ¶ 7, DIP Credit Agreement 2.12(a)]**

The DIP Obligations, pursuant to section 364(c)(1) of the Bankruptcy Code, shall at all times constitute a Superpriority Claim in the Case.

**Carve-Out:**

**[Interim Order at ¶ 7(b)]**

Paragraph 7(b) of the Interim Order provides for the Carve Out. Allowed Professional Expenses incurred through the date of service of a Carve Out Trigger Notice shall be paid in accordance with the respective Budget amounts for each Case Professional. All accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals after the date of service of a Carve Out Trigger Notice are provided for under the Carve Out in an aggregate amount of $150,000 but are not specifically allocated between the Debtor's Professionals and the Committee's Professionals.

**Financial Covenants and Reporting:**

**[DIP Credit Agreement § 6.1, 6.2, 6.19 Schedule 6.1, 6.2]**

The Borrower has agreed to (a) Deliver to Lender copies of each of the financial statements, reports, and other items set forth on Schedule 6.1 of the DIP Credit Agreement no later than the times specified therein. Borrower agrees to maintain a system of accounting that enables it to produce financial statements in accordance with GAAP. Borrower shall maintain its billing systems/practices substantially as in effect as of the Closing Date and shall only make material modifications following prior notice to and consent of Lender; and (b) Provide Lender with each of the reports set forth on Schedule 6.2 of the DIP Credit Agreement at the times specified therein. In addition, Borrower agrees to use commercially reasonable efforts in cooperation with Lender to facilitate and implement a system of electronic collateral reporting in order to provide electronic reporting of each of the items set forth on such Schedule.

Not later than two (2) Business Days after the close of each

weekly period (i.e. each Friday) after the Petition Date, Borrower shall deliver a variance and compliance report (the "Compliance Report"), in form and substance satisfactory to Lender and certified by the CRO or the Borrower's Chief Financial Officer, on behalf of Borrower, (a) setting forth (i) actual results against anticipated results under the Budget for the most recently ended calendar week on a line item basis and in the aggregate as of the end of such calendar week and (ii) the variance in dollar amounts and percentages (including a report with detail reasonably satisfactory to Lender regarding any variance in excess of 10%) and (b) including a certification of the CRO as to Borrower's compliance or non-compliance with the Permitted Variance.

| | |
|---|---|
| **Payment Prepetition Senior Obligations:**<br><br>**[Interim Order at ¶ 16(c)]** | Paragraph 16(c) of the Interim Order provides for the use of proceeds of the DIP Facility to make a $1,500,000 payment on the Prepetition Obligations, |
| **Application of Asset Disposition Proceeds:**<br><br>**[Interim Order at ¶ 16(c); DIP Credit Agreement § 2.7, 2.8]** | $2,000,000 from the proceeds of any sale of the Debtor's business and assets must be paid at closing to reduce the Prepetition Obligations.<br><br>The DIP Facility must be repaid from the proceeds of any Sale. |
| **Release of Postpetition Lender:**<br><br>**[Interim Order at ¶ 4(f); DIP Credit Agreement § 16.15]** | Borrower hereby forever releases, acquits and discharges Lender and its Affiliates, agents and representatives and their successors and assigns from any and all claims with respect to any actions or inaction taken or not taken by Lender or any such other Person, including that Lender is in any way responsible for the past, current, or future condition or deterioration of the business operations and/or financial condition of Borrower, and from any and all claims that Lender breached or may have breached any agreement to loan money or make other financial accommodations available to Borrower, any processor related agreement, any loan and security agreement, including any guarantee, or to fund any operations of Borrower at any time. In addition, Borrower shall require that any claims by any creditor or interest holder, the Official Committee, and/or the U.S. Trustee, with respect to any of the above-referenced issues, shall be made within not later than 75 days of the Petition Date or such later date as may be ordered by the Bankruptcy Court (the "Investigation Period"), otherwise such claims shall be enjoined and released. |

| | |
|---|---|
| **Debtor's Stipulations, Challenge Period, and Release of Claims Against Prepetition Secured Lenders:**<br><br>**[Interim Order at ¶¶ 4]** | The Debtor stipulates to the validity, amount, and priority of Bancorp's prepetition claims and liens, subject to the rights of third parties to challenge such liens and claims as set forth in paragraph 20 of the Interim Order. |
| **Section 506(c) Waivers:**<br><br>**[Interim Order at ¶ 10, 11]** | Upon entry of a final order providing for such relief, except to the extent of the Carve Out, no expenses of administration of the Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral, the Prepetition Collateral or the Replacement Collateral, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender as the case may be, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender. |
| **Indemnification:**<br><br>**[DIP Credit Agreement at 10.3]** | Borrower shall pay, indemnify, defend, and hold the Lender-Related Persons (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), at any time asserted against, imposed upon, or incurred by any of them (a) in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring, waiver, amendment, forbearance or workout with respect hereto) of the DIP Credit Agreement, any of the other Loan Documents, the Interim Order, the Final Order or the transactions contemplated hereby or thereby or the monitoring of compliance by Borrower and each of its Subsidiaries with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to the DIP Credit Agreement, any other Loan Document, the Interim Order, the Final Order or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, (c) in connection with the custody, preservation, use or operation of, or, upon an Event of Default, the sale of, collection from, or other realization upon, any of the Collateral in accordance with |

the DIP Credit Agreement and the other Loan Documents, (d) with respect to the failure by Borrower to perform or observe any of the provisions of the Loan Agreement or any other Loan Document, (e) in connection with the exercise or enforcement of any of the rights of Lender hereunder or under any other Loan Document, (f) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any assets or properties owned, leased or operated by Borrower or any of its Subsidiaries or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any such assets or properties of Borrower or any of its Subsidiaries (g) in connection with the negotiation, preparation and filing and recordation of the Loan Documents, the Interim Order and the Final Order, (h) obtaining of approval of the Loan Documents by the Bankruptcy Court, (i) the preparation and review of pleadings, documents and reports related to the Case or any subsequent case under chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to the Case or any subsequent case under chapter 7 of the Bankruptcy Code, (j) general monitoring of the Case or any subsequent case under chapter 7 of the Bankruptcy Code; (k) in connection with or as a result of the enforcement, performance or administration of (i) the Existing Credit Agreement and Processing Agreements, together with any and all amendments thereto (including for any such actions prior to or subsequently to the instant bankruptcy filing) and (ii) the Stock Pledge (including the Acknowledgement of the Stock Pledge) and the Guaranty, together with any and all amendments thereto (including for any such actions prior to or subsequently to the instant bankruptcy filing (collectively the within "(k)(ii)", the "Enforcement Indemnity"), and (l) any continuation, transfer and/or transition agreement(s), as the case may be, required as part of the Sale, and Sale Order, (each and all of the foregoing, including the Enforcement Indemnity, the "Indemnified Liabilities"). The foregoing to the contrary notwithstanding, Borrower shall not have any obligation to any Indemnified Person under Section 10.3 of the DIP Credit Agreement with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence or willful misconduct of such Indemnified Person or its officers, directors, employees, or attorneys. This provision shall survive the termination of the DIP Credit Agreement and the repayment of the Obligations. If any Indemnified Person makes any payment to any other Indemnified Person with respect to an Indemnified Liability as to which Borrower was required to indemnify the Indemnified Person receiving such

payment, the Indemnified Person making such payment is entitled to be indemnified and reimbursed by Borrower with respect thereto. WITHOUT LIMITATION, THE FOREGOING INDEMNITY SHALL APPLY TO EACH INDEMNIFIED PERSON WITH RESPECT TO INDEMNIFIED LIABILITIES WHICH IN WHOLE OR IN PART ARE CAUSED BY OR ARISE OUT OF ANY NEGLIGENT ACT OR OMISSION OF SUCH INDEMNIFIED PERSON OR OF ANY OTHER PERSON.

In addition  in furtherance of the indemnification, at the closing of the sale of the business, an escrow will  be established at Bancorp in the amount of $2.5MM to be held against such indemnification obligations.

38.    In accordance with Local Rule 4001-2, the Debtor highlights the following provisions of the Interim Order:

a)    **Debtor's Stipulations**.  Paragraph 4 of the Interim Order provides for certain stipulations by the Debtor regarding the claims, liens and collateral of Bancorp in its capacity as Prepetition Lender.  However, these stipulations are subject to challenge periods that are consistent with the minimum periods contemplated by Local Rule 4001-2(a)(i)(B).

b)    **506(c) Waivers**.  Paragraph 10 and 11 of the Interim Order provides for the waiver of the Debtor's rights under section 506(c) of the Bankruptcy Code that takes effect upon entry of the Final Order.  The section 506(c) waivers are discussed in paragraphs 56-57 below.

c)    **Liens on Proceeds of Avoidance Actions**.  Paragraph 8 of the Interim Order provide for liens on the Collateral, which includes avoidance actions, but such liens on avoidance actions are subject to attach entry of the Final Order.

d)    **Payment of Prepetition Obligations**.  Paragraph 16(c) of the Interim Order provides for the use of proceeds of the DIP Facility to make a $1,500,000 payment on the Prepetition Obligations, which is discussed in paragraphs 50-52 below.

e)    **Professional Fee Carve Out**.  Paragraph 7(b) of the Interim Order provides for the Carve Out.  Allowed Professional Expenses incurred through the date of service of a Carve Out Trigger Notice shall be paid in accordance with the respective Budget amounts for each Case Professional. All accrued and unpaid fees, disbursements, costs and expenses incurred by the Case Professionals after the date of service of a Carve Out Trigger

Notice are provided for under the Carve Out in an aggregate amount of $150,000 but are not specifically allocated between the Debtor's Professionals and the Committee's Professionals.

f)    **Priming of Prepetition Liens**.  Paragraph 8(a) of the Interim Order provides that, subject to entry of a Final Order, the liens securing the DIP Obligations will be senior to and prime all existing liens securing the Debtor's obligations.  However, pending entry of the Final Order, any valid, perfected and unavoidable Permitted Liens in existence immediately prior to the Petition Date, that, as of the Petition Date, are senior to the liens of Bancorp securing the Prepetition Obligations, if any, will not be primed but will be subject to the junior liens provided for in paragraph 8(c) instead.  Bancorp has consented to the priming of its prepetition liens and the Debtor does not believe that there are any prepetition liens senior to Bancorp's prepetition liens.

g)    **"Equities of the Case" Waiver**.  Paragraph 11 includes, among other things, subject to entry of a Final Order, a waiver of any rights to pursue an "equities of the case" claim under section 552(b) of the Bankruptcy Code.

h)    **Section 105 Waiver**.  Paragraph 9  includes, subject to entry of a Final Order, a waiver of the Debtor's right to seeking relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Lender set forth in the Interim Order or the DIP Facility.

## BASIS FOR RELIEF REQUESTED

**A.**    **Approval Under Section 364(a) of the Bankruptcy Code**

39.    The Debtor proposes to obtain financing under the DIP Facility by providing security interests and liens as set forth above pursuant to sections 364(c) and (d) of the Bankruptcy Code.  The statutory requirement for obtaining postpetition credit under Section 364 of the Bankruptcy Code is a finding, made after notice and a hearing, that the debtor is "unable to obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] . . ."  11 U.S.C. § 364(c).  Financing pursuant to section 364(c) of the Bankruptcy Code is appropriate when the trustee or debtor in possession is unable to obtain unsecured credit allowable as an

ordinary administrative claim.  See In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

40.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364 of the Bankruptcy Code.  Specifically, courts look to whether:

(a)     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.* by allowing a lender only an administrative claim;

(b)     the credit transaction is necessary to preserve the assets of the estate; and

(c)     the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender.

In re Ames Dep't Stores, 115 B.R. at 37-39; see also In re St. Mary Hospital, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); In re Crouse Group, 71 B.R. at 549.  A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.  See In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986); see also In re Plabell Rubber Prods., Inc., 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

41.     The Debtor has an urgent need for cash to continue its operations and preserve the value of its assets as a going concern.  While the Debtor has negotiated a proposed sale to the Purchaser (which is subject to higher and better offers), the Debtor has no unencumbered cash.  As a result, new borrowings are essential to preserve the Debtor's value pending the sale.

Absent such borrowings, the Debtor would be unable to continue its business, thus imperiling its going concern value and ability to accomplish the sale to the Purchaser.  As a result, obtaining credit is necessary.

42.     After assessing the Debtor's financial condition, its capital structure and the absence of any unencumbered assets, the Debtor's do not believe they would be able to obtain cash on an unsecured basis.  In fact, the Debtor has attempted for the past several weeks to solicit more favorable financing, with no success.

43.     Finally, given the Debtor's financial condition and performance and existing capital structure, the Debtor believes the terms of the DIP Facility are fair, reasonable and adequate.  First, the DIP Facility allows the Debtor to borrow in accordance with the Budget up to $2,750,000 on an interim basis and up to $5,000,000 on a final basis.  The Debtor reasonably believes that these amounts will allow it to continue its operations pending the closing of a sale.  Second, the Debtor believes that the financial terms of the DIP Facility are reasonable for borrowings by a distressed company, including after taking into account the Debtor's prepetition capital structure and financing terms in the period leading up to its Chapter 11 filing.  Third, the other terms of the DIP Facility, including the protections provided to the DIP Lender to secure repayment of the DIP Obligations are consistent with provisions included in other secured debtor in possession financing facilities.  Finally, the DIP Facility was negotiated between the Debtor and the DIP Lender at arm's-length with the parties represented by counsel.

**B.**     **Approval of Priming Liens and Adequate Protection Under Section 364(d)**

44.     If a debtor is unable to obtain credit under the provisions of section 364(c) of the Bankruptcy Code, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien."  11 U.S.C. §

364(d).  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of postpetition

debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing,

authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on

property of the estate that is subject to a lien only if--

(a)     the trustee is unable to obtain credit otherwise; and

(b)     there is adequate protection of the interest of the holder of the lien
         on the property of the estate on which such senior or equal lien is
         proposed to be granted.

11 U.S.C. § 364(d).  Consent by a secured creditor to priming obviates the need to show

adequate protection.  See Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 122 (N.D.

Ga. 1989) ("by tacitly consenting to the superpriority lien, those [undersecured] creditors

relieved the debtor of having to demonstrate that they were adequately protected.").

45.     The Bankruptcy Code does not explicitly define "adequate protection."  Section

361 of the Bankruptcy Code does, however, provide three nonexclusive examples of what may

constitute "adequate protection" of an interest of an entity in property under sections 362, 363 or

364 of the Bankruptcy Code:

(a)     requiring the trustee to make a cash payment or periodic cash
         payments to such entity, to the extent that the  . . . use . . . under
         section 363 of this title, or any grant of a lien under section 364 of
         this title results in a decrease in the value of such entity's interest
         in such property;

(b)     providing to such entity an additional or replacement lien to the
         extent that such . . . use . . . or grant results in a decrease in the
         value of such entity's interest in such property; or

(c)     granting such other relief . . . as will result in the realization by
         such entity of the indubitable equivalent of such entity's interest in
         such property.

11 U.S.C. § 361.  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.  See In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."  Id. (quoting In re Becker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

46.    Similarly, the Bankruptcy Code does not expressly define the nature and extent of the "interest in property" of which a secured creditor is entitled to adequate protection under sections 361, 363 and 364 of the Bankruptcy Code.  However, the Bankruptcy Code plainly contemplates that a qualifying interest demands protection only to the extent that the use of the creditor's collateral will result in a decrease in "the value of such entity's interest in such property."  See 11 U.S.C. § 361.  Indeed, courts have repeatedly held that the purpose of adequate protection "is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."  In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); see also In re Mosello, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996) (same); Bank of New England v. BWL, Inc., 121 B.R. 413, 418 (D. Me. 1990) (same); In re Becker Indus. Corp., 58 B.R. at 736 (focus of adequate protection "is protection of the secured creditor from diminution in the value of its collateral during the reorganization process").

47.    As an initial matter, the adequate protection provided to Bancorp has been consented to by Bancorp, thereby satisfying the requirements of section 364(d).  See Anchor Savs. Bank, 99 B.R. at 122.  Nonetheless, the Debtor submits that the adequate protection provided under the proposed Interim Order is sufficient and appropriate in these cases.  Indeed the continued operation of the Debtor's businesses, which will be made possible by the proceeds from the DIP Facility, will allow the Debtor to preserve the going concern value of its business,

thereby preserving the value of Bancorp's collateral against the alternative -- a liquidation of the Debtor's assets.  In addition, Bancorp is receiving Adequate Protection Liens, a superpriority adequate protection claim pursuant to Section 507(b) of the Bankruptcy Code, a cash payment of $1,500,000 to reduce the Prepetition Obligations, payment of accrued and unpaid interest on the Prepetition Obligations at closing of the DIP Facility and thereafter on a monthly basis and payment of the fees and expenses of professionals for Bancorp.

## C.    **Authorization and Approval of Payment of Portion of Prepetition Obligations**

48.    The Debtor's agreement to the payment of $1,500,000.00 of the Prepetition Obligations should be approved pursuant to sections 363 and 105(a) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  In addition, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

49.    The proposed use, sale or lease of property of the estate may be approved under section 363(b) of the Bankruptcy Code if it is supported by sound business justification.  See In re Montgomery Ward, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions.").  Although established in the context of a proposed sale, the "business judgment" standard has been applied in non-sale situations.  See, e.g., Institutional Creditors of Continental Air Lines v. Continental Air Lines (In re Continental Air Lines), 780 F.2d 1223, 1226 (5th Cir. 1986) (court applied "business judgment" standard in context of proposed "use" of estate property).  Moreover, pursuant to section 105 of the

Bankruptcy Code, the Court has expansive equitable powers to fashion any order or decree which is in the interest of preserving or protecting the value of the debtor's assets.  See, e.g., In re Chinichian, 784 F.2d 1440, 1443 (9th Cir. 1986).

50.     Paying down the Prepetition Obligations from the DIP Facility proceeds is supported by sound business judgment as those are negotiated provisions of, and will allow the Debtor to obtain, the DIP Facility.  As noted above, the Debtor was unable to obtain consent to use cash collateral, had no unencumbered cash as of the Petition Date and received no more favorable alternative postpetition financing proposals.  This payment was a requirement to Bancorp consenting to the priming of its prepetition liens and use of its cash collateral during these cases, as well as the DIP Lender's willingness to lend.  Here, the DIP Facility is necessary and is the Debtor's only way to preserve its going concern value and maximize returns for its stakeholders through a sale.  As a result, it is appropriate to permit the Debtor to pay down $1,500,000 of the Prepetition Obligations.

**D.     Use of Cash Collateral**

51.     Section 363 of the Bankruptcy Code governs the Debtor's use of property of the estate.[3]  Section 363 of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

---

[3]     Pursuant to section 1107 of the Bankruptcy Code, a debtor in possession has all the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with section 363 of the Bankruptcy Code.  See 11 U.S.C. § 1107(a).

52.     Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code.  Specifically, a trustee or debtor in possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

    (A)    each entity that has an interest in such collateral consents; or

    (B)    the court, after notice and a hearing, authorizes such use sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

53.     As set forth above, Bancorp has consented to the use of its cash collateral in connection with the DIP Facility and the provision of adequate protection as set forth herein.

**E.      The Section 506(c) Waivers Should be Approved**

54.     The Court should approve the Debtor's waiver of any right to surcharge under section 506(c).  Such waivers and provisions are standard and customary under financings between sophisticated parties.  As one court noted in discussing the later enforceability of such waivers, "the Trustee and Debtors-In-Possession in this case had significant interests in asserting claims under § 506(c) and have made use of their rights against the Lender under § 506(c) by waiving them in exchange for concessions to the estate (including a substantial carve-out for the benefit of administrative creditors)."  In re Molten Metal Technology, Inc., 244 B.R. 515, 527 (Bankr. D. Mass. 2000); see also In re Nutri/System of Florida Assocs. 178 B.R. 645, 650 (E.D. Pa. 1995) (noting that debtor had waived § 506(c) rights in obtaining debtor in possession financing); In re Telesphere Communications, Inc., 179 B.R. 544, 549 (Bankr. N.D. Ill. 1994) (approving settlement between debtor and certain lenders wherein debtor waived certain rights -- including 506(c) rights -- against the lenders in exchange for valuable consideration).

55.     The waiver of surcharge rights is particularly appropriate where, as here, it is tied to the benefit to be received from both the post-petition funding being provided by the DIP Lender and the Carve-Out.  In other words, the Debtor has waived the uncertainty of surcharge rights in exchange for immediate liquidity from the DIP Lender and the valuable and predictable rights granted to the Debtor's and other estate professionals under the Carve Out.  <u>See In re Lunan Family Restaurants Ltd. P'ship</u>, 192 B.R. 173, 178 (N.D. Ill. 1996) ("The burden of proof is on any proponent of § 506(c) treatment, who must show by a preponderance of evidence that [(1) the expenditure was necessary, (2) the amounts were reasonable, and (3) the secured creditor was the party primarily benefited by the expenditure].") (citing <u>In re Flagstaff</u>, 739 F.2d 73, 77 (2d Cir. 1984) and <u>New Orleans Public Service Inc. v. Delta Towers, Ltd. (In re Delta Towers)</u>, 112 B.R. 811, 815 (E.D. La. 1990), <u>rev'd on other grounds sub nom.</u>, <u>In re Delta Towers</u>, 924 F.2d 74 (5th Cir. 1991).

**F.      <u>Modification of Automatic Stay</u>**

56.     The DIP Facility contemplates a modification of the automatic stay to the extent applicable and necessary, to permit the parties to implement the terms of the Interim Order and Final Order and, upon the occurrence of the Termination Date, to exercise all rights and remedies in the Interim Order subject to the requirement that the parties shall use best efforts to schedule and attend a hearing before the Court to determine solely whether a Termination Date has occurred within three (3) days of providing notice that a Termination Date has occurred. Provisions of this kind are standard in debtor in possession financing and are reasonable under the circumstances.

RLF1 10534696v.3

**G.**    **Interim Approval Should be Granted**

57.    Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

58.    The Debtor requests that the Court immediately hold and conduct the Interim Hearing to consider entry of the Interim Order authorizing the Debtor from and after entry of the Interim Order until the Final Hearing to borrower an amount sufficient to fund operating expenses and to use cash collateral.  This relief will enable the Debtor to operate its business in a manner that will permit them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to its estate and all parties in interest, pending the Final Hearing.

59.    Pending entry of the Final Order, the Debtor will require $2,750,000 in available financing to provide for the working capital needs of the Debtor (as set forth in the Budget).  Such interim availability will avoid a disruption in the Debtor's operations pending the Final Hearing and will provide the Debtor's customers, vendors and employees with the level of confidence necessary to continue operating.

**REQUEST FOR INTERIM AND FINAL HEARINGS**

60.    Pursuant to Local Rule 4001-2(c), the Final Order may only be entered after notice and a hearing and the Debtor should ordinarily schedule a hearing to consider the Final Order at least seven (7) days after the organizational meeting of the creditors' committee.  The

Debtor shall, within forty-eight (48) hours of the entry of the Interim Order by the Court, serve by first-class mail, a copy of the Interim Order and a notice of the Final Hearing (the "**Final Hearing Notice**") to consider entry of the Final Order on the date established by the Court.

61.     Any party in interest objecting to the relief sought at the Final Hearing shall file and serve objections, which objections shall: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; and (iii) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware no later than seven (7) business days before the Final Hearing and served upon the following parties so as to be received not less than seven (7) business days before the Final Hearing:  (a) Richards Layton & Finger, P.A. One Rodney Square, 920 North King Street, Wilmington, Delaware 19801 Attn: Mark D. Collins), counsel to the Debtor; (b) Foley & Lardner LLP, 90 Park Avenue, New York, NY 10016 (Attn: Douglas Spelfogel and Richard Bernard), counsel to the DIP Lender; and (c) the Office of the United States Trustee for the District of Delaware,, 844 North King Street, Wilmington, Delaware 19801, Attn: Benjamin Hackman.

62.     Pursuant to Bankruptcy Rule 4001(b)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable and fix the date and time prior to the Final Hearing for parties to file objections to the relief requested by this Motion.  Such relief is necessary in order to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to the Debtor's estate.

## NOTICE

63.     Notice of this Motion will be given to: (a) the Office of the United States Trustee for the District of Delaware, (b) the DIP Lender, (c) the Internal Revenue Service, (d) other known holders of liens, (e) the parties included on the Debtor's list of twenty (20) largest unsecured creditors, (f) counsel to the proposed stalking horse purchaser, a wholly owned-

subsidiary of North American Bancard; (g) counsel to Raymond Moyer, the Debtor's majority stockholder; and (h) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Initial Notice Parties**").  The Debtor will serve copies of the Motion and any order entered in respect of the Motion as required by Rule 9013-1(m) of the Local Rules.  The Debtor submits that, under the circumstances, no other or further notice is required.

64.     In the event the Court enters an interim order granting this Motion (the "**Interim Order**"), the Debtor proposes to serve notice of such entry on the Initial Notice Parties and all parties that have filed prior to such service date requests for notice pursuant to Bankruptcy Rule 2002.  The notice will provide that any objections to the relief granted in the Interim Order must be filed with the Court and served upon counsel for the Debtor no later than seven days prior to the final hearing to be held on the Motion (the "**Objection Deadline**").  If an objection is timely filed and served prior to the Objection Deadline, such objection will be heard at the final hearing on the Motion.  If no objections are timely filed and served, the Debtor's counsel will file a certification of counsel to that effect attaching a final form of order.

## NO PRIOR REQUEST

65.     No previous request for relief sought herein has been made to this Court or any other court.

WHEREFORE, the Debtor respectfully request that the Court enter an order, substantially in the form attached hereto as **Exhibit A** granting:  (i) the relief requested herein; and (ii) such other and further relief to the Debtor as the Court may deem proper.

Date: August 4, 2014
      Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**

Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
L. Katherine Good (No. 5101)
Marisa A. Terranova (No. 5396)
920 N. King Street
Wilmington, Delaware 19801
Telephone:  302-651-7700
Facsimile:  302-651-7701
Email: collins@rlf.com
      silberglied@rlf.com
      good@rlf.com

*Proposed Counsel for Debtor and Debtor in Possession*