**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Phoenix Payment Systems, Inc., | Case No. 14-_____ (_____) |
| Debtor. | |

**DEBTOR'S MOTION TO (A) ESTABLISH BIDDING PROCEDURES**
**RELATED TO THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S**
**ASSETS, APPROVE RELATED BID PROTECTIONS AND ESTABLISH**
**NOTICE PROCEDURES FOR DETERMINING CURE AMOUNTS,**
**AND (B) APPROVE THE SALE OF SUBSTANTIALLY ALL**
**OF THE DEBTOR'S ASSETS AND ASSUME AND ASSIGN**
**CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

The debtor and debtor in possession (the "**Debtor**" or the "**Seller**", as applicable) hereby moves, pursuant to 11 U.S.C. §§ 105, 363, 365, 503 and 507 and Fed. R. Bankr. Proc. 2002, 6004 and 6006 for entry of two orders. The first, the "**Bidding Procedures Order**", attached hereto as **Exhibit A**, requests that the Court (A) establish bidding and auction procedures (the "**Bidding Procedures**") in connection with the sale of substantially all of the Debtor's assets (the "**Assets**") free and clear of all claims and any other interests, liens, mortgages, pledges, security interests, rights of first refusal, obligations and encumbrances of any kind whatsoever (collectively, the "**Interests**"), except to the extent identified in a Winning Bidder's (as defined below) asset purchase agreement; (B) approve the proposed bid protections, including the termination fee (the "**Break-Up Fee**") and expense reimbursement (the "**Expense Reimbursement**"), to EPX Acquisition Company, LLC (the "**Purchaser**" or the "**Stalking Horse Bidder**", as applicable), which is an affiliate of North American Bancard, LLC ("**NAB**"), in accordance with the Asset Purchase Agreement dated July 31, 2014 (the "**Stalking Horse**

**Agreement**"),[1] a copy of which is attached hereto as **Exhibit B**; (C) schedule an auction (the "**Auction**") and set a date and time for a sale hearing (the "**Sale Hearing**") for the sale of the Assets (the "**Sale**"), and approve the form and manner of notice thereof; (D) establish procedures for noticing and determining cure amounts for executory contracts ("**Executory Contracts**") and unexpired leases ("**Leases**") to be assumed and assigned in connection with the Sale; and (E) grant certain related relief.

The second order, the "**Sale Order**", attached hereto as **Exhibit C**, requests that, at the Sale Hearing, subject to the results of the Auction, the Court (A) approve and authorize the Sale, free and clear of all Interests, except to the extent set forth in the Winning Bidder's (as defined below) asset purchase agreement; and (B) authorize the assumption and assignment of certain Executory Contracts and Leases.  In support hereof, the Debtor respectfully represents:

## **JURISDICTION**

1.     This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.[2]

## **GENERAL BACKGROUND**

2.     On August 4, 2014 (the "**Petition Date**"), the Debtor filed a voluntary chapter 11 petition commencing this case.  The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Additional information regarding the Debtor's business and the background relating to the events leading up to this case can be found in the *Declaration of Michael E. Jacoby in Support of*

---

[1]     Unless otherwise indicated, capitalized terms that are used herein and not otherwise defined shall have the meanings assigned to such terms in the Stalking Horse Agreement.

[2]     The Debtor confirms its consent pursuant to Local Rule 9013-1(f) to the entry of a final order by this Court.

*Chapter 11 Petition and First Day Motions* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

## BACKGROUND ON THE SALE

### A.    The Marketing Process and the Stalking Horse Agreement

3.    As described in greater detail in the First Day Declaration, the Debtor first acknowledged a default to the Bancorp Bank ("**Bancorp**") in 2012, including defaults under operational agreements such as a sponsorship agreement, an ISO agreement and a processor agreement, as well as defaults under financial accommodation agreements.  As a result, it has operated under forbearance agreements since that time.

4.    For years, the Debtor was actively seeking to raise capital.  While it obtained small amounts of common and preferred equity over the years, its efforts never raised an amount sufficient to fund the business.  While the Debtor continued focusing on obtaining equity raises in late 2013, it also obtained one or more non-binding indications of interest (the "**Preliminary Indications**") from buyers that were interested in acquiring the Assets as a going concern. However, the Preliminary Indications were not pursued at that time.

5.    Following the Debtor's retention of Michael Jacoby of PMCM, LLC (an affiliate of Phoenix Management Services) as Chief Restructuring Officer on February 3, 2014, the Debtor retained Raymond James & Associates, Inc. ("**Raymond James**") as its investment banker on February 25, 2014.  Immediately upon becoming retained, Raymond James facilitated a marketing process for a transaction with the Debtor of any type, including a sale, recapitalization or investment in the Debtor (a "**Potential Transaction**").  With the Debtor's assistance, Raymond James identified financial and strategic investors (collectively, the "**Interested Parties**") to garner interest in pursuing a Potential Transaction.  Commencing on March 25, 2014, Raymond James contacted and sent teasers to 140 Interested Parties.  Fifty-four

(54) of them executed non-disclosure agreements and were asked to submit initial non-binding letters of intent ("**Initial LOIs**") by April 23, 2014.  Interested Parties that had executed non-disclosure agreements were then given the opportunity to access an electronic data room.  On or around that date, nine (9) Interested Parties submitted Initial LOIs, all of which focused on acquiring the Assets or the Debtor's Stock.  Accordingly, at that point, the Debtor devoted its attention and focus to pursuing a sale of the Assets or its stock.[3]  Thereafter, six (6) Interested Parties attended management presentations at the Debtor's offices in Delaware or Arizona.

6.    Due, in large part, to the Debtor receiving a significant amount of interest from Interested Parties, and with the expectation that Interested Parties would increase and/or otherwise refine their offers for the Assets or the Debtor's stock once they performed further diligence, Raymond James requested that Interested Parties submit revised non-binding letters of intent ("**2ⁿᵈ Round LOIs**") by May 27, 2014.  On or around the deadline, four (4) Interested Parties submitted 2ⁿᵈ Round LOIs.  After reviewing and carefully considering the letters of intent, the Debtor, in consultation with its advisors, (i) determined that it should provide Interested Parties with the option to submit yet another non-binding letter of intent ("**Best and Final LOIs**") to further increase the proposed purchase price for the Assets or the Debtor's stock and (ii) set June 17, 2014 as the deadline to submit Best and Final LOIs.  On or around such date, four (4) Interested Parties submitted Best and Final LOIs.  After reviewing and carefully considering the letters of intent, the Debtor determined, in consultation with its advisors, that the Best and Final LOI submitted by NAB was the highest or otherwise best offer.

7.    On June 19, 2014, the Debtor executed a binding letter of intent with NAB (the "**NAB LOI**"), which included a thirty-day exclusivity period (the "**Exclusivity Period**").  The

---

[3]    The Debtor entertained both in-court and out-of-court solutions, and continued to do so until shortly before signing the Stalking Horse Agreement.

Exclusivity Period was set to expire on July 19, 2014. However, the Debtor, in consultation with its advisors, agreed to extend such period for an additional fifteen (15) days in exchange for NAB improving the terms of its proposed purchase of the Assets.

8.      On July 31, 2014, the Debtor and the Purchaser entered into the Stalking Horse Agreement. As a result of the robust and multi-staged pre-petition marketing process conducted by Raymond James, the proposed purchase price for the Assets under the Stalking Horse Agreement is **3.5 times greater** than the Preliminary Indication received late in 2013 from the very same bidder. Moreover, the Stalking Horse Agreement provides the Debtor with a firm commitment that is not subject to any financing or due diligence contingencies and thereby provides the Debtor with a floor against which other bidders can submit competing bids for the Assets through an auction process.

9.      The Stalking Horse Agreement's $50 million purchase price also is highly attractive in that it is sufficient to pay all undisputed creditors in full and still leaves a substantial recovery for the Debtor's equity security holders.

B.      **Proposed Timeline for Sale of Assets**

10.     Pursuant to Section 7.1 of the Stalking Horse Agreement, the Debtor is obligated to use its reasonable best efforts to cause the hearing on entry of the Bid Procedures Order to be held on or before twenty-two (22) days from the date hereof. In addition, pursuant to Section 7.2 of the Stalking Horse Agreement, the Debtor is required to seek a Bid Procedures Order which schedules the Auction for a date which is no later than forty-five (45) days from the date hereof and schedule the Sale Hearing for a date that is no later than three (3) Business Days following the Auction. Finally, Section 4.4(a) of the Stalking Horse Agreement provides both the Debtor

and the Purchaser with the right to terminate the Stalking Horse Agreement unless the Closing occurs on or before October 31, 2014 (the "Termination Date").[4]

11.     Consistent with these requirements, the Debtor proposes the following timeline for conducting the Sale process:

| Event | Deadline |
|---|---|
| Proposed Bidding Procedures Hearing……... | On or about August 26, 2014 |
| Proposed Bid Deadline …………………….. | On or about September 12, 2014 |
| Auction……………………………………… | On or about September 18, 2014 |
| Sale Hearing………………………...…..... | On or about September 23, 2014 |

12.     Given the Debtor's extensive prepetition marketing efforts, the proposed timeline is more than sufficient to complete a fair and open sale process that will maximize the value received for the Assets.  The most likely competing bidders are among those who previously submitted a letter of intent or had access to the data room during the prepetition process.  Thus, these parties need minimal time to submit competing bids.  If new bidders emerge, the proposed timeline will provide them with sufficient time to perform due diligence given that the process is well understood at this juncture.  Thus, the schedule is sufficient, while respecting the necessity to consummate the Sale as quickly as possible to maximize the value received for the Assets.

C.     **Terms of the Stalking Horse Agreement**

13.     A summary of the pertinent terms of the Stalking Horse Agreement, including the terms to be highlighted pursuant to Local Rule 6004-1, is as follows:[5]

---

[4]     If, however, the Closing has not occurred by the Termination Date due to the conditions to Closing set forth in Sections 10.3(c) or 10.3(f) of the Stalking Horse Agreement remaining unsatisfied (unless such conditions have been waived by the Parties), and if all other conditions to the respective obligations of the Parties to close under the Stalking Horse Agreement that are capable of being fulfilled by the Termination Date shall have been so fulfilled or waived, then no Party may terminate the Stalking Horse Agreement prior to the date that is sixty (60) days after the Termination Date.

[5]     The following summary is qualified in its entirety by reference to the provisions of the Stalking Horse Agreement. In the event of any inconsistencies between the provisions of the Stalking Horse Agreement and the terms herein, the terms of the Stalking Horse Agreement shall control. Unless otherwise defined in the summary set

- **Assets**:  Section 2.1 of the Stalking Horse Agreement lists the Purchased Assets, which are comprised of substantially all of the Debtor's assets (excluding the Excluded Assets).

- **Assumed Liabilities**:  As set forth in Section 2.3 of the Stalking Horse Agreement, only certain liabilities will be assumed by the Purchaser, primarily relating to the Seller's Business.  The Purchaser will not assume any of the Excluded Liabilities.

- **Purchase Price**: Section 3.1(a) of the Stalking Horse Agreement provides that the Purchase Price for the Purchased Assets shall be (i) the Closing Payment Amount plus or minus (ii) the Adjustment Amount plus (iii) the assumption of the Assumed Liabilities.  Pursuant to Section 3.1(b) of the Stalking Horse Agreement, the Closing Payment Amount is an amount in cash equal to (i) $50,000,000 less (ii) the Cure Amounts that Purchaser is required to pay pursuant to Section 2.5 of the Stalking Horse Agreement.

- **Termination and Other Deadlines**:  Section 4.4(a) of the Stalking Horse Agreement allows either Party to terminate the Stalking Horse Agreement if the Closing has not occurred by the Termination Date (which date may be extended for an additional sixty (60) days in the circumstances described in Section 4.4(a) of the Stalking Horse Agreement). In addition, pursuant to Section 7.2 of the Stalking Horse Agreement, the Debtor is required to seek an Auction date which is no later than forty-five (45) days from today and schedule the Sale Hearing within three (3) Business Days following the Auction.

- **Management Services Agreement**:  Pursuant to Section 8.12 of the Stalking Horse Agreement, in order to support the continued and uninterrupted operation of the Debtor's business following the Closing Date and to facilitate the possible transition of Bancorp's role as the sponsor bank to another entity, the Stalking Horse Bidder and the Debtor intend to enter into the Management Services Agreement.  Pursuant to such agreement, unless such agreement provides otherwise, the Stalking Horse Bidder shall provide, or cause NAB or one of NAB's direct or indirect wholly-own subsidiaries to provide, the Debtor with certain services until the later of (i) the date certain operating agreements with Bancorp have terminated and (ii) May 31, 2015.  In exchange for such services, unless the Management Services Agreement otherwise provides, the Stalking Horse Bidder shall receive a management fee which is equal to all of the revenue that the Debtor receives in the operation of its business minus only the direct expenses incurred by the Debtor.

---

forth in the accompanying text, capitalized terms shall have the meanings assigned to such terms in the Stalking Horse Agreement.

- **Break-Up Fee and Expense Reimbursement**: The Break-Up Fee is $1,5000,000 (equal to three percent (3%) of $50,000,000, which is the maximum cash portion of the Purchase Price paid by the Stalking Horse Bidder at Closing) and the Expense Reimbursement includes the actual out-of-pocket documented (to the reasonable satisfaction of the Seller) expenses incurred on or after June 19, 2014, by the Purchaser in connection with the Transactions, with a cap of $500,000.  Section 7.10 of the Stalking Horse Agreement provides that, subject to Court approval, if the Seller consummates a Competing Transaction prior to or upon the confirmation of a chapter 11 plan, then the Seller shall pay the Purchaser the Break-Up Fee and the Expense Reimbursement contemporaneously with the closing of such Competing Transaction, subject to the Seller's receipt of the supporting documentation required by Section 7.10 of the Stalking Horse Agreement.   Subject to the approval of the Court, if the Purchaser terminates the Stalking Horse Agreement pursuant to Section 4.4(e) thereof, then the Seller shall pay Purchaser the Expense Reimbursement.

- **Closing Conditions**.  The respective obligations of the Purchaser and the Seller to consummate the closing are subject to the satisfaction or waiver of the closing conditions set forth in Article X of the Stalking Horse Agreement.

- **Good Faith Deposit**.   Pursuant to Section 3.2 of the Stalking Horse Agreement, the Purchaser deposited with Richards, Layton & Finger, P.A., in its capacity as escrow holder, Five Million Dollars ($5,000,000).

- **Exclusivity Period**.   Pursuant to Section 7.7(a) of the Stalking Horse Agreement, from the date hereof until the entry of the Bidding Procedures Order, the Seller will neither negotiate nor accept any additional bids or offers regarding the purchase of the Purchased Assets.  However, upon the Seller filing this Motion, it may provide access to the electronic data room established for the transactions to any Person who may be considering acquiring the Purchased Assets and may answer questions from any such Person; provided, however, that until the Bidding Procedures Order has been entered, the Seller, whether by itself or through any representatives or advisors, may not negotiate the acquisition of the Purchased Assets with any such Person, and the Seller's management shall not have management meetings with any such Person.

- **Record Retention**.  Section 8.7 of the Stalking Horse Agreement provides that each of the Seller and the Purchaser agree to preserve and keep the records, or in the case of the Seller, arrange for the preservation and keeping of the records, held by it or their Affiliates relating to the Business for a period of six (6) years from the Closing Date, and shall make such

records and personnel available to the other Party, subject to the provisions of Section 8.6 thereof, as may be reasonably required by such Party in connection with, among other things, any insurance claims, Legal Proceedings or Tax audits against or governmental investigations of Seller or Purchaser or any of their Affiliates, administering this case, including in connection with any motion or claim objection filed or to be filed by or against the Seller in this case, winding up the Seller, or in order to enable the Seller or the Purchaser to comply with its obligations under the Stalking Horse Agreement and each other agreement, document or instrument contemplated by such agreements.

- **No Successor Liability**.  Paragraph 25 of the Sale Order provides that, except as may be expressly set forth in the Stalking Horse Agreement with respect to the Assumed Liabilities and the Permitted Exceptions, the transfer of the Purchased Assets, including, without limitation, the assumption, assignment and transfer of any Purchased Contract, to the Purchaser shall not cause or result in the Purchaser, any of its Affiliates or subsidiaries, or any of their respective Representatives, having any liability, obligation, or responsibility for, or any Purchased Assets being subject to or being recourse for, any Interest whatsoever, whether arising under any doctrines of successor, transferee or vicarious liability, breach of fiduciary duty, aiding or abetting breach of fiduciary duty or otherwise, whether at Law or in equity, directly or indirectly, and whether by payment, setoff, recoupment, or otherwise.

- **Use of Proceeds**.  Paragraph 30 of the Sale Order provides that, upon the Closing (or as soon as practicable thereafter), $2,000,000 of the cash proceeds from the Sale shall be used by the Debtor to pay down amounts that the Debtor owes to Bancorp arising prior to the Petition Date.

- **Relief From Bankruptcy Rule 6004(h)**.  Paragraph 31 of the Sale Order provides that the Sale Order will be effective and enforceable immediately upon entry.

## RELIEF REQUESTED

14.    By this Motion, the Debtor seeks entry of the Bidding Procedures Order: (A) approving the Bidding Procedures; (B) approving the Break-Up Fee and the Expense Reimbursement in accordance with the Stalking Horse Agreement; (C) scheduling the Auction (if necessary) and a Sale Hearing, and approving the form and manner of notice thereof; and (D) establishing the Cure Procedures (as defined below).

9

15.     The Debtor requests that this Court set the Sale Hearing on or about September 23, 2014.  At the Sale Hearing, pending the outcome of the Auction and as set forth in the Bidding Procedures, the Debtor intends to seek entry of a Sale Order (A) approving the Sale, free and clear of all Interests, and (B) authorizing the assumption and assignment of certain Executory Contracts and Leases.

## BASIS FOR RELIEF

### A.     Necessity for Sale

16.     Given the continuing defaults under the Bancorp Agreements, the inability to raise cash, a sustained liquidity crisis with no end in sight, more than one dozen actual or threatened lawsuits, and the likelihood of losing its sponsor bank, the Debtor determined that the most effective way to preserve the Debtor's going concern value for the benefit of its stakeholders was through a sale of the Debtor's assets following a thorough marketing process. The Debtor submits that a Sale of the Assets, along the timeline proposed herein, will achieve such goal.  Indeed, the Sale will pay all creditors in full and return a substantial distribution to equity holders.  In the absence of a sale transaction conducted in accordance with such timeline, the Debtor may lose its sponsor bank, face deterioration in the value of the business and be unable to continue operations.  In addition, the Stalking Horse Bidder would only agree to acquire the Assets pursuant to the Stalking Horse Agreement if the sale contemplated thereby was conducted in accordance with the timeline proposed herein.  As such, unless the Sale is conducted in accordance with such timeline, the Debtor may lose the benefit of the Stalking Horse Bidder.

RLF1 10583448v.3

B.     **The Bidding Procedures**[6]

17.     In order to maximize value for the benefit of the Debtor's estate and its stakeholders, the Debtor seeks to implement a competitive bidding process that is designed to generate maximum value for the Assets.  As described more fully in the Bidding Procedures, attached as **Schedule 1** to the Bidding Procedures Order attached hereto as **Exhibit A**, the Debtor seeks approval to sell the Assets to a Qualified Bidder that makes the highest or otherwise best offer for the Assets.

18.     As described more fully in the Bidding Procedures, the Debtor requests that competing bids for the Assets be governed by the following procedures:[7]

- **Bid Deadline**.     Any party interested in submitting a bid (a "**Bidder**") must transmit such bid (a "**Bid**") via electronic mail to the parties identified on **Schedule 1** to the Bidding Procedures not later than 5:00 p.m. (prevailing Eastern Time) on September 12, 2014 (the "**Bid Deadline**").

- **Required Bid Materials**.  To constitute a "Qualified Bid", a Bid (other than the Stalking Horse Agreement, which shall constitute a Qualified Bid for all purposes) must be a written irrevocable offer from a Qualified Bidder (as defined below) and provide for the following:

    (i)     **Identification of Potential Bidder**.  Identification of the party submitting the bid (the "**Potential Bidder**") (and any equity holders, in the case of a Potential Bidder which is an entity specially formed for the purpose of effectuating the contemplated transaction) and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction.

    (ii)     **Asset Purchase Agreement**.  An executed copy of an asset purchase agreement providing for the purchase of substantially all of the assets of the Debtor along with a redline marked against the Stalking Horse Agreement reflecting variations from the Stalking

---

[6]     Terms used but not otherwise defined in this section of this Motion shall have the meanings ascribed to them in the Bidding Procedures attached as **Schedule 1** to the Bidding Procedures Order.

[7]     The following description of the Bidding Procedures is only a summary of the terms set forth in the Bidding Procedures attached as **Schedule 1** to the Bidding Procedures Order. The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures. In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall control.

Horse Agreement.  The Debtor may consider any bids, including those which may propose alternative transaction structures to the Stalking Horse Agreement.

(iii)   **Management Services Agreement**.    An executed copy of a management services agreement providing for the operations of Debtor's business, along with a redline marked against the Management Services Agreement reflecting variations from such agreement.

(iv)   **Financing**.    Evidence of the Potential Bidder's ability to consummate the transaction and payment of the purchase price in cash at the Closing, including, but not limited to:

(a)    a signed commitment for any debt or equity financing;

(b)    a bank or other account statement showing the ability of a Potential Bidder to pay cash for the Assets;

(c)    contact names and numbers for verification of financing sources; and

(d)    any additional information or evidence, satisfactory to the Debtor, in its discretion, as requested to validate the ability to fund the Minimum Bid Amount (defined below),

(v)    **Minimum Bid Amount**.  The bid must be higher or otherwise better than the offer of the Stalking Horse Bidder under the Stalking Horse Agreement.  To be higher or otherwise better than the offer of the Stalking Horse Bidder such bid must be valued in an amount that is at least the equivalent of $52,500,000 (the "**Minimum Bid Amount**").[8]

(vi)   **Irrevocability of Bid**.  A letter stating that the Potential Bidder's offer is irrevocable and binding until the first business day after the Assets for which the Potential Bidder is submitting a bid have been sold pursuant to the closing of the sale or sales approved by the Court.

(vii)  **Bid Deposit**.  A cash deposit in the amount of $5,250,000 by wire transfer or certified or cashier's check, which amount shall be made payable to the Debtor.

---

[8]    The Minimum Bid Amount represents the initial overbid amount of $500,000 plus $50,000,000 (which is the maximum cash portion of the Purchase Price paid by the Stalking Horse Bidder at Closing) plus the Break-Up Fee (which is $1,500,000 (or three percent (3%) of $50,000,000)) plus the Expense Reimbursement (which, for purposes of determining the Minimum Bid Amount, is $500,000).

(viii)   **Identification of Executory Contracts and Leases**.  The bid shall identify with particularity the Debtor's executory contracts and unexpired leases with respect to which the Potential Bidder seeks to receive an assignment and any designation rights it seeks.

(ix)    **No Financing or Diligence Constituencies**.  The bid shall not contain any due diligence or financing contingencies of any kind.

(x)     **Consent to Jurisdiction**.  The bid shall state that the offering party consents to the jurisdiction of the Court.

(xi)    **Corporate Authority**.   The bid shall include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the submitted asset purchase agreement of the Potential Bidder.

(xii)   **Adequate Assurance Information**.   The bid shall include sufficient financial or other information (the "**Adequate Assurance Information**") to establish adequate assurance of future performance with respect to any lease or contract to be assumed and assigned to the bidder in connection with the proposed transaction.  The bid shall also identify a contact person (with relevant contact information) that counterparties to any lease or contract can contact to obtain additional Adequate Assurance Information.

(xiii)  **Other Information.** Include such other information as may be reasonably requested in writing by the Debtor prior to the Auction.

A "**Qualified Bidder**" is a Potential Bidder that delivers the documents described in subparagraphs (i)-(xiii) above, and that the Debtor determines, in consultation with Bancorp and the official committee of unsecured creditors (the "**Creditors' Committee**") (if any), is reasonably likely (based on financial information submitted by the Potential Bidder, the availability of financing, experience and other consideration deemed relevant by the Debtor) to be able to consummate a sale if selected as the Winning Bidder.  Notwithstanding the foregoing, the Stalking Horse Bidder shall be deemed a Qualified Bidder.  Not later than two (2) business days after the Bid Deadline, the Debtor shall determine and shall notify the Potential Bidder, if such Potential Bidder is a Qualified Bidder.  On or prior to 11:59 p.m. (prevailing Eastern Time) on the day of the Bid Deadline, the Debtor will notify the parties identified on **Schedule 1** to the Bid Procedures and the Stalking Horse Bidder by electronic mail of any extension of the Bid Deadline.  A bid from a Qualified Bidder is a "**Qualified Bid**." No later than three (3) business days after the Bid Deadline, the Debtor shall provide copies of all Qualified Bids (other than the Stalking Horse Bidder's bid) by electronic mail to the parties identified on **Schedule 1** to the Bid Procedures and all Qualified Bidders (including the Stalking Horse Bidder).

- **Minimum Bid Increment**.    Unless otherwise agreed by the Debtor, in consultation with Bancorp and the Creditors' Committee (if any), subsequent bids at the Auction shall not provide consideration of less than $250,000 in excess of the preceding bid.

- **Auction**.  If a Qualified Bid, other than that submitted by the Stalking Horse Bidder, has been received by the Debtor, the Debtor will conduct the Auction with respect to all or some of the Assets. The Auction shall be conducted at the offices of Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, Delaware 19801 at a date and time determined by the Court, or such other place and time as the Debtor, in consultation with Bancorp and the Creditors' Committee (if any), may determine.

## C.    **Break-Up Fee and Expense Reimbursement**

19.    All of the Interested Parties (including NAB) that submitted a Best and Final LOI to purchase the Assets required a break-up fee and expense reimbursement.  Presumably, this was because such break-up fee and expense reimbursement provided Interested Parties with some assurance that they will be compensated for the considerable time and expense needed to enter into definitive documentation and the risk that arises from participating in the bidding and subsequent auction process.  To be sure, given the significant interest that the Debtor received prior to the Petition Date from Interested Parties, the Debtor believes that an Auction is highly likely.  In addition, since NAB entered into the NAB LOI, NAB has, in fact, incurred considerable time and expense negotiating the Stalking Horse Agreement and the related documents, including the Management Services Agreement.  Other potential bidders will benefit from the time and expense that the Stalking Horse Bidder spent negotiating and finalizing such documents. As such, the Debtor believes that providing the Stalking Horse Bidder with the Break-Up Fee and the Expense Reimbursement was appropriate in order to compensate the Stalking Horse Bidder for the time and expense that it incurred in negotiating the definitive documentation and the risk that it may be outbid at the Auction.

20.    In addition to compensating the Stalking Horse Bidder, providing the Stalking Horse Bidder with the Break-Up Fee and the Expense Reimbursement (which the Stalking Horse Bidder required as a condition to entering into the Stalking Horse Agreement) will benefit the Debtor's estate because the purchase price in the Stalking Horse Agreement establishes a floor and promotes more competitive bidding. Specifically, the purchase price in the Stalking Horse Agreement sends a message to the marketplace that the Assets are worth at least such price. Without that floor, there is a real risk that the ultimate purchase price for the Assets may be undervalued.

**D.    Notice of Bidding Procedures, Auction and Sale**

21.    *Notice of Sale Hearing.*  On the date the notice of motion and hearing of this Motion is filed, the Debtor caused this Motion and all exhibits hereto, including the Stalking Horse Agreement, the Bidding Procedures and a copy of the proposed Bidding Procedures Order, by first-class mail, postage prepaid, to be served upon (a) the United States Trustee for the District of Delaware; (b) Bancorp; (c) the creditors listed on the Debtor's consolidated list of 20 largest unsecured creditors, as filed with the Debtor's chapter 11 petition; (d) counsel to the Stalking Horse Bidder; (e) all parties asserting a security interest in the Assets to the extent any such interest is reasonably known to the Debtor; (f) each of the Debtor's landlords and any notice parties identified in the Leases; (g) various federal, state, county and city tax and regulatory authorities; (h) all entities known to have expressed an interest in a transaction with respect to the Assets since February 3, 2014 or that have been identified by the Debtor or its advisors as a potential purchaser of the Assets; (i) the Federal Trade Commission; (j) the United States Attorney General/Antitrust Division of the Department of Justice; (k) local and state environmental authorities and the federal Environmental Protection Agency; (l) local, state and federal authorities and agencies that have issued licenses or permits to the Debtor with respect to

15

the operation and use of the Assets; (m) American Express, Visa, Mastercard and Discover, (n) counsel to Raymond Moyer, (o) all of the Debtor's creditors, and (p) all parties requesting notice pursuant to Bankruptcy Rule 2002 (collectively, the "**Sale Notice Parties**").

22.     *Notice of Sale*.  Within three (3) days of the entry of the Bidding Procedures Order or as soon thereafter as practicable, the Debtor shall cause to be served, by first-class mail, postage prepaid, a sale notice (the "**Notice of Auction and Sale Hearing**") setting forth, among other things, the dates established for submission of Qualified Bids, the Auction and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as **Schedule 2**, upon the Sale Notice Parties.

23.     *Post-Auction Notice*.  As soon as possible after the conclusion of the Auction, the Debtor shall file, but not serve, a notice identifying any winning bidder (the "**Winning Bidder**").

**E.     The Cure Procedures**

24.     The Debtor requests the following procedures (the "**Cure Procedures**") for notifying counterparties to Executory Contracts and Leases of potential Cure Amounts (as defined below) with respect to those Executory Contracts and Leases that the Debtor may seek to assume and assign on the Closing Date.

25.     Within three (3) days of the entry of the Bidding Procedures Order, the Debtor will file a notice of potential assumption, assignment and/or transfer of the Executory Contracts and Leases listed therein (the "**Designated Executory Contracts**"), substantially in the form attached to the Bidding Procedures Order as **Schedule 3** (the "**Notice of Assumption and Assignment**"), and serve such notice on all non-debtor parties to the Designated Executory Contracts (the "**Contract Notice Parties**").

26.     The Notice of Assumption and Assignment shall identify the calculation of the cure amounts, if any, that the Debtor believes must be paid to cure all defaults outstanding under

16

each Designated Executory Contract (the "**Cure Amounts**") as of such date.  The Notice of Assumption and Assignment shall also contain information regarding how a non-debtor party to a Designated Executory Contract may obtain adequate assurance of future performance information from the Stalking Horse Bidder (the "**Stalking Horse Adequate Assurance Information**").  The Notice of Assumption and Assignment shall set a deadline by which the non-debtor party to a Designated Executory Contract may file an objection to the Cure Amount, the Stalking Horse Adequate Assurance Information or the assumption and assignment of such contract or lease.  In addition, if the Debtor identifies additional Contracts or Leases that might be assumed by the Debtor and assigned that are not set forth in the original Notice of Assumption and Assignment, the Debtor shall promptly send a supplemental notice (a "**Supplemental Notice of Assumption and Assignment**") to the applicable counterparties to such additional Contracts and Leases.

27.    The Debtor requests that this Court set the deadline to object to any Cure Amount, the Stalking Horse Adequate Assurance Information or the assumption and assignment of any Designated Executory Contract as three (3) days prior to the Auction; provided, however, that in the event that the Winning Bidder is not the Stalking Horse Bidder, the Debtor proposes that any objections solely as it relates to whether such bidder can provide adequate assurance of future performance may be raised at the Sale Hearing.  To that end, the Notice of Assumption and Assignment and any Supplemental Notice of Assumption and Assignment shall also provide that objections to any Cure Amount, the Stalking Horse Adequate Assurance Information or the assumption and assignment of any Designated Executory Contract will be heard at the Sale Hearing or at a later hearing, as determined by the Debtor subject to the Court's calendar.

28.     The procedures and the Stalking Horse Agreement also contemplate that the Debtor or the Purchaser may determine to exclude any Designated Executory Contract from the list of Purchased Assets no later than three (3) days prior to the date of the Auction and may add any Designated Contract to the list of Purchased Assets no later than one (1) Business Day prior to the Closing Date.

29.     At the Sale Hearing, the Debtor and/or the Winning Bidder shall (i) present evidence necessary to demonstrate adequate assurance of future performance by any Winning Bidder and (ii) request entry of an order requesting approval of the assumption and assignment of any or all Executory Contracts and Leases to be assumed and assigned on the Closing Date to any Winning Bidder.  For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interests of all parties-in-interest.

## APPLICABLE AUTHORITY

30.     "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" Continuing Creditors' Committee of Star Telecomms., Inc. v. Edgecomb, 385 F. Supp. 2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Committee of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F. Supp. 2d 538, 555 n.111 (D. Del. 2008).  Thus, this Court should grant the relief requested in this Motion if the Debtor demonstrates a sound business justification therefor.  See In re Delaware Hudson Ry. Co., 124 B.R. 169, 179 (Bankr. D. Del. 1991).

31.     As discussed above, the Debtor determined that the most effective way to preserve the Debtor's going concern value for the benefit of its stakeholders was through a sale of the Debtor's assets following a thorough marketing process.  The Debtor submits that a Sale

of the Assets, along the timeline proposed herein, will achieve such goal.  In the absence of a sale transaction conducted in accordance with such timeline, the Debtor may face deterioration in the value of the business and be unable to continue operations. As such, the Debtor submits that it has demonstrated a sound business justification for the relief requested herein.

**A.     The Bidding Procedures are Fair and are Designed to Maximize the Value Received for the Assets**

32.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).   The Debtor submits that the Bidding Procedures are appropriate to ensure that the bidding process is fair and reasonable and will yield the maximum value for its stakeholders.  Among other things, the Bidding Procedures (i) provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid, especially given the substantial pre-petition marketing described above, (ii) are designed to maximize the value received for the Assets by facilitating a competitive bidding process in which all potential bidders are encouraged to participate and submit competing bids, and (iii) will provide the Debtor with the opportunity to consider all competing offers and to select the highest or otherwise best offer for the sale of substantially all of the Assets.

33.     The Debtor requests this Court's approval of the Bidding Procedures, including the dates established thereby for an Auction and a Sale Hearing.  Accordingly, the Debtor and all parties-in-interest can be assured that the consideration for the Assets will be fair and reasonable, and there are sound business reasons to approve the Bidding Procedures.

B.     **The Bid Protections Are Necessary to Preserve the Value of the Debtor's Estate**

34.     Pursuant to Bankruptcy Rule 6004(f)(1), a sale of property outside the ordinary course of business may be by private sale or by public auction.  Having the ability to offer the Break-Up Fee and the Expense Reimbursement to the Stalking Horse Bidder will likely maximize the realizable value of the Assets for the benefit of the Debtor's estate. Cf. ¶ 20, supra.

35.     Approval of the Break-Up Fee and the Expense Reimbursement is governed by standards for determining the appropriateness of bid protections in the bankruptcy context. Courts have identified at least two instances in which bid protections may benefit the estate. First, a break-up fee or expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 537 (3d Cir. 1999) (hereinafter, "O'Brien"); see also Reliant Energy Channelview LP v. Kelson Channelview LLC, 594 F.3d 200, 206-07 (3d Cir. 2010) (hereinafter, "Reliant").  Second, if the availability of break-up fees and expense reimbursements were to induce a bidder to research the value of the debtor and convert the value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth.  Reliant, 594 F.3d at 206-07; O'Brien, 181 F.3d at 537.

36.     The O'Brien court reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

> A.     the presence of self-dealing or manipulation in negotiating the break-up fee;
>
> B.     whether the fee harms, rather than encourages, bidding;

  C.  the reasonableness of the break-up fee relative to the purchase price;

  D.  whether the unsuccessful bidder placed the estate property in a "sales configuration mode" to attract other bidders to the auction;

  E.  the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders;

  F.  the correlation of the fee to a maximum of value of the debtor's estate;

  G.  the support of the principal secured creditors and creditors committee of the break-up fee;

  H.  the benefits of the safeguards to the debtor's estate; and

  I.  the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

See O'Brien, 181 F.3d at 536.

37.  Here, and as is set forth in greater detail supra, the Break-Up Fee and the Expense Reimbursement are necessary to preserve the value of the Debtor's estate because they will enable the Debtor to secure an adequate floor for the Assets and to therefore insist that competing bids be materially higher or otherwise better than the Stalking Horse Agreement — a clear benefit to the Debtor's estate.  Moreover, the Stalking Horse Bidder (and the other Interested Parties that submitted a Best and Final LOI for the purchase of the Assets) would not agree to act as a stalking horse without the Break-Up Fee and the Expense Reimbursement given the substantial time and expense that would be incurred in connection with entering into definitive documentation and the risk that it will be outbid at the Auction.  Without the Break-Up Fee and the Expense Reimbursement, the Debtor might lose the opportunity to obtain the highest or otherwise best offer for the Assets and would certainly lose the downside protection that will be afforded by the existence of the Stalking Horse Bidder.  Furthermore, the bid of the Stalking Horse Bidder sends a message to all potential bidders that the Assets are at least worth the

purchase price in such agreement.  Therefore, without the benefit of the bid of the Stalking Horse Bidder (*i.e.,* a bid providing the floor), the bids received at auction for the Assets could be substantially lower than the bid offered by the Stalking Horse Bidder.

38.    "The usual rule is that if break-up fees encourage bidding, they are enforceable; if they stifle bidding, they are not enforceable."  The Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 660 (S.D.N.Y. 1992).  The Debtor does not believe that the Break-Up Fee and the Expense Reimbursement will stifle bidding.  To the contrary, the Debtor believes that, should an auction be held, such bid protections will encourage bidding by serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders."  Id. at 662.

39.    Here, the bid of the Stalking Horse Bidder serves all three functions.  First, the Stalking Horse Bidder would not enter into the Stalking Horse Agreement without the Break-Up Fee and the Expense Reimbursement.  Second, pursuant to the Bidding Procedures, any bidder that wishes to participate in the Auction must submit an offer that is higher or otherwise better than the bid of the Stalking Horse Bidder.  Third, the bid of the Stalking Horse Bidder attracts additional bidders because, among other things, additional bidders will be able to save considerable time and expense because they can use many of the documents that the Stalking Horse Bidder heavily negotiated, including, among other things, the Stalking Horse Agreement, the schedules thereto and the Management Services Agreements, in making their bid.  In sum, if the Assets are sold to a competing bidder, the Sale likely will be the result of Stalking Horse Bidder's crucial role as an initial bidder generating interest in the Assets and establishing a minimum acceptable price and offer against which other parties can bid.

40.    In addition, "[a] break-up fee should constitute a fair and reasonable percentage of the proposed purchase price, and should be reasonably related to the risk, effort, and expenses of the prospective purchaser.   When reasonable in relation to the bidder's efforts and to the magnitude of the transaction, break-up fees are generally permissible." Id.

41.    Here, the Break-Up Fee is equal to $1,500,000 (or three percent (3%) of $50,000,000, which is the maximum cash portion of the Purchase Price paid by the Stalking Horse Bidder at Closing).   When considered together with the Expense Reimbursement up to $500,000 (*i.e.*, one percent (1%) of the purchase price), the four percent (4%) combined total is consistent with the range of bid protections typically paid in sale transactions that have been approved by this Court.   Given the size of the purchase price, the Debtor believes that the amounts of the Break-Up Fee and the Expense Reimbursement are appropriate.

## C.    Approval of the Sale is Warranted Under Bankruptcy Code 363(b)

42.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."   11 U.S.C. § 363(b)(1).   Although Section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, courts in this district and elsewhere have found that a debtor's sale or use of assets outside the ordinary course of business should be approved if the debtor can demonstrate a sound business justification for the proposed transaction.   See, e.g., In re Eagle Picher Holdings, Inc., 2005 Bankr. LEXIS 2894, at ¶ 3 (Banter. S.D. Ohio 2005); In re Martin, 91 F.3d 389, 395 (3d Cir. 1996); In re Abbotts Dairies of Penn., Inc., 788 F.2d 143 (3d Cir. 1986); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983).   Once a debtor articulates a valid business justification, "[t]he business judgment rule 'is a presumption that in making the business decision the directors of a corporation acted on an informed basis, in good faith and in

the honest belief that the action was in the best interests of the company.'" In re S.N.A. Nut Co., 186 B.R. 98 (Bonier. N.D. Ill. 1995); see also In re Integrated Res., Inc., 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992); In re Johns-Manville Corp., 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("a presumption of reasonableness attaches to a Debtor's management decisions").

43.     The sale of a debtor's assets is appropriate where there are sound business reasons behind such a determination.  See Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (Bankr. D. Del. 1999); In re Del. & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991); Stephens Indus., Inc. v. McClung, 789 F.2d 386 (6th Cir. 1986) (sale of substantially all assets of estate authorized where "a sound business purpose dictates such action").

44.     The Debtor is running a fair and open process in chapter 11 after already having run a fair, comprehensive prepetition marketing effort.  The combined result achieves the objective of obtaining the highest or otherwise best offer and sale of its business for the benefit of the Debtor's estate.  The Sale of the Assets will be subject to competing bids, enhancing the Debtor's ability to receive the highest or otherwise best value for the Assets.  Consequently, the fairness and reasonableness of the consideration to be received by the Debtor will ultimately be demonstrated by a "market check" through the auction process, which is the best means for establishing whether a fair and reasonable price is being paid.

45.     For the reasons outlined above, the Debtor believes that its entry into the Stalking Horse Agreement and other ancillary documents is a sound exercise of its business judgment and supported by the facts and circumstances of this case.

46.    In addition, all creditors and parties-in-interest will receive adequate notice of the Bidding Procedures and Sale Hearing as set forth above.  Such notice is reasonably calculated to provide timely and adequate notice to the Debtor's major creditor constituencies, those parties most interested in the Chapter 11 Case, those parties potentially interested in bidding on the Assets and others whose interests are potentially implicated by a proposed Sale.  Accordingly, consummating the Sale as soon as possible is in the best interests of the Debtor and its stakeholders and parties-in-interest.

**D.    The Proposed Sale Satisfies the Requirements of Section 363(f) for a Sale Free and Clear of Interests**

47.    Section 363(f) of the Bankruptcy Code permits a debtor to sell assets free and clear of all liens, claims, interests, charges and encumbrances (with any such liens, claims, interests, charges, and encumbrances attaching to the net proceeds of the sale with the same rights and priorities therein as in the sold assets).  As Section 363(f) of the Bankruptcy Code is stated in the disjunctive, when proceeding pursuant to Section 363(b), it is only necessary to meet one of the five conditions of Section 363(f).  <u>Citicorp Homeowners Servs., Inc. v. Elliot</u>, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (stating that Section 363(f) of the Bankruptcy Code is written in the disjunctive; holding that if any of the five conditions of Section 363(f) are met, the trustee has the authority to conduct the sale free and clear of all liens).  The Debtor is prepared to demonstrate at the Sale Hearing that it has satisfied one or more of these conditions.

**E.    <u>A Winning Bidder Should be Entitled to the Protections of Section 363(m)</u>**

48.    Pursuant to Section 363(m) of the Bankruptcy Code, a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  <u>See</u> <u>In re Abbotts Dairies</u>, 788 F.2d at 147; <u>In re Mark Bell Furniture Warehouse, Inc.</u>, 992 F.2d 7, 9 (1st Cir. 1993); <u>In re Willemain V. Kivitz</u>, 764 F.2d 1019, 1023 (4th Cir. 1985).

49.     The Stalking Horse Agreement was negotiated at arm's length, with both parties represented by their own counsel.  Additionally, the Debtor will adduce facts at the Sale Hearing demonstrating that any bidder who is deemed a Winning Bidder for the Assets had negotiated at arm's length, with all parties represented by their own counsel.

50.     Accordingly, the Sale Order will include a provision that the Winning Bidder for the Assets, is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code.  The Debtor believes that providing any Winning Bidder with such protection will ensure that the maximum price will be received by the Debtor for the Assets and that closing of the Sale will occur promptly.

**F.     The Assumption and Assignment of Executory Contracts and Unexpired Leases**

51.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  See e.g., In re Stable Mews Assoc., Inc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.  See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3rd. Cir. 1989).  The business judgment test "requires only that the trustee [or debtor-in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984)).  Any more exacting scrutiny would slow the

administration of a debtors' estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten this Court's ability to control a case impartially.  See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to Section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

52.    Once an executory contract is assumed, the trustee or debtor-in-possession may elect to assign such contract.  See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Doge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of Section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

53.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc., 103 B. R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when a prospective assignee of a

lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

54.     Additionally, information will be included in the Notice of Assignment and Assumption as part of the Stalking Horse Adequate Assurance Information, including contact information on where adequate assurance information can be obtained.  Adequate assurance of future performance with respect to any Winning Bidder who is not the Stalking Horse Bidder shall be presented at the Sale Hearing.  Based upon the Debtor's own diligence, it can represent that upon closing, the Stalking Horse Bidder (either individually or as a result of a guaranty with its parent, NAB) will have financial resources that are more than sufficient to perform under any Executory Contracts or Leases it seeks to have the Debtor assume and assign.  If necessary, the Debtor will adduce facts at the Sale Hearing to refute any objection, demonstrating the financial wherewithal of the Stalking Horse Bidder or any Winning Bidder, and their willingness and ability to perform under the Executory Contracts and Leases to be assumed and assigned.  The Sale Hearing therefore will provide this Court and other interested parties with ample opportunity to evaluate and, if necessary, challenge the ability of any Winning Bidder to provide adequate assurance of future performance under the Executory Contracts and Leases that the Debtor seeks to assume and assign.

55.     Accordingly, the Debtor respectfully submits that the procedures proposed herein for Executory Contracts and Leases being assumed and assigned on the Closing Date are appropriate and reasonably tailored to provide Contract Notice Parties with adequate notice in the form of the Notice of Assignment and Assumption of the proposed assumption and/or assignment of their applicable contract, as well as proposed Cure Amounts, if applicable.

56.     Furthermore, to the extent that any defaults exist under any Executory Contract or Lease that is to be assumed and assigned in connection with the Sale of the Assets, the Winning Bidder or the Debtor (as applicable under the Winning Bidder's asset purchase agreement) will cure any such default contemporaneously with or as soon as practicable after consummation of an assumption and assignment of such Executory Contract or Lease.

57.     Accordingly, this Court therefore should have a sufficient basis to authorize the Debtor to assume and assign Executory Contracts and Leases as may be set forth in any Winning Bidder's asset purchase agreement.

## G.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate

58.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property... is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease... is stayed until the expiration of the 14 days after the entry of the order, unless the court orders otherwise."  The Debtor requests that any Sale Order be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## NOTICE

59.     The Debtor shall serve a copy of this Motion by first class mail upon:  (a) the United States Trustee for the District of Delaware; (b) Bancorp; (c) the creditors listed on the Debtor's consolidated list of 20 largest unsecured creditors, as filed with the Debtor's chapter 11 petition; (d) counsel to the Stalking Horse Bidder; (e) all parties asserting a security interest in the Assets to the extent any such interest is reasonably known to the Debtor; (f) each of the Debtor's landlords and any notice parties identified in the Leases, to the extent possible; (g) various federal, state, county and city tax and regulatory authorities; (h) all entities known to

have expressed an interest in a transaction with respect to the Assets since February 3, 2014 or that has been identified by the Debtor or its advisors as a potential purchaser of the Assets; (i) the Federal Trade Commission; (j) the United States Attorney General/Antitrust Division of the Department of Justice; (k) local and state environmental authorities and the federal Environmental Protection Agency; (l) local, state and federal authorities and agencies that have issued licenses or permits to the Debtor with respect to the operation and use of the Purchased Assets; (m) American Express, Visa, Mastercard and Discover; (n) counsel to Raymond Moyer and (o) all parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtor submits that no further notice is required or needed under the circumstances.

## NO PRIOR REQUEST

60.    No prior motion for the relief requested herein has been made to this Court or any other Court.

[*Remainder of page intentionally blank*]

WHEREFORE, the Debtor respectfully request that this Court enter the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**, (A) approving the Bidding Procedures; (B) approving the Break-Up Fee and the Expense Reimbursement; (C) scheduling an Auction and a Sale Hearing to approve such sale, and approving the form and manner of notice thereof; (D) approving the Cure Procedures; and (E) granting such other and further relief as this Court deems appropriate.  Additionally, the Debtor requests that at the Sale Hearing, this Court enter a Sale Order, subject to the result of the Auction and to the Bidding Procedures, (A) approving and authorizing the Sale; (B) authorizing the assumption and assignment of certain Executory Contracts and Leases; and (C) granting such other and further relief as this Court deems appropriate.

Date: August 4, 2014
     Wilmington, Delaware

**RICHARDS, LAYTON & FINGER, P.A.**

/s/ *Mark D. Collins*
Mark D. Collins (No. 2981)
Russell C. Silberglied (No. 3462)
Paul N. Heath (No. 3704)
Zachary I. Shapiro (No. 5103)
920 N. King Street
Wilmington, Delaware 19801
Telephone:  302-651-7700
Facsimile:  302-651-7701
Email: collins@rlf.com
       silberglied@rlf.com
       heath@rlf.com
       shapiro@rlf.com

Proposed Counsel for the Debtor and Debtor in Possession